NATIONAL DISTILLERS AND CHEMICAL CORPORATION and National Hydrocarbons, Inc., Plaintiffs,

v.

DEPARTMENT OF ENERGY and Charles W. Duncan, Secretary of Energy, Defendants.

Civ. A. No. 79–399.

United States District Court, D. Delaware.

Sept. 30, 1980.

Charles F. Richards, Jr., and Stephen E. Herrmann of Richards, Layton & Finger, Wilmington, Del., Edward J. Ross and Michael A. Small of Breed, Abbott & Morgan, New York City, John P. Mathis and David T. Douthwaite of Baker & Botts, Washington, D. C., of counsel, for plaintiffs.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Alice Daniel, Acting Asst. Atty. Gen., C. Max Vassanelli, Dina R. Lassow, Brenda Goranflo and Thomas W. Millet, Attys., Dept. of Justice, Don W. Crockett and Ellen Spangler, Dept. of Energy, Washington, D. C., of counsel, for defendants.

## OPINION

LATCHUM, Chief Judge.

In this action, plaintiffs, National Distillers and Chemical Corporation ("Distillers") and its wholly owned subsidiary, National Hydrocarbons, Inc. ("Hydrocarbons"), seek a judicial determination that plaintiffs' pricing practices with respect to certain sales of propane and butane to Phillips Petroleum Company ("Phillips") are valid, and request that defendants, the Department of Energy ("DOE") and Charles W. Duncan, Secretary of DOE, be enjoined from pursuing enforcement proceedings arising out of these pricing practices against plaintiffs. Presently before the Court is the DOE's motion to dismiss the complaint on the grounds that the claims therein presented are not ripe for judicial review, that plaintiffs have failed to exhaust their administrative remedies, and that venue is not proper in this Court. The Court, having carefully considered the arguments presented by the parties, concludes for the reasons hereinafter stated that the DOE's motion to dismiss must be granted.

### I. *Background of the Case*

Distillers is a Virginia corporation engaged in the production and marketing of polyethylene and other product derivatives of ethane. Since 1953, Distillers has owned and operated a gas processing and petrochemical plant at Tuscola, Illinois in which these products are produced. Pursuant to a

contract negotiated in 1951, and renewed in 1962, Panhandle Eastern Pipe Line Company ("Panhandle") supplies Distillers with a "wet" natural gas stream [1] containing the ethane required by Distillers as feedstock for its petrochemical operations. Distillers extracts from the wet natural gas stream ethane and unfractionated natural gas liquids ("NGLs"), consisting of a mixed stream of butane, propane and natural gasoline. Distillers then fractionates these natural gas liquids into the separate natural gas liquid products ("NGL products") described above, namely, butane, propane and natural gasoline. After the extraction process is completed, Distillers returns the residue of the wet natural gas stream to Panhandle.

Unlike the ethane extracted from the wet natural gas stream, the propane, butane and natural gasoline are not marketed by Distillers. Instead, under a contract negotiated in 1951, and renewed continuously since then, Distillers sells the three by-products to Phillips. Historically, Distillers has been compensated by Phillips under an arrangement whereby Phillips resells the products to its own customers at a fixed price per unit of volume, as determined by Phillips, and then pays Distillers a percentage of its revenues from the sales. The percentage of revenues paid to Distillers was fixed in 1951 at 90% and has remained at that level. The sale revenues upon which this 90% payment is based are calculated differently for propane and butane. With respect to propane sales, Phillips pays Distillers 90% of the "weighted average resale price" of Phillips' total sales of propane within a geographic area. This weighted average resale price includes resales of propane originally purchased from producers other than Distillers, as well as from Distillers itself. In contrast, with respect to butane purchases, Phillips pays Distillers 90% of the "actual resale price" of the specific butane purchased from Distillers and subsequently resold by Phillips. The third by-product of Distillers' extraction process, natural gasoline, is sold by Distillers to Phillips at a fixed price per unit of volume.[2]

The pricing regulations applicable to the sale of NGLs and NGL products, including propane and butane, have their origin in the petroleum price regulations promulgated initially by the Cost of Living Council ("CLC") under the provisions of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. Section 203 of this Act authorized the President "to issue such orders and regulations as he deems appropriate . . . to stabilize prices, rents, wages and salaries . . . ." *Id.* The President delegated this authority to the CLC, Executive Order 11615, 36 Fed.Reg. 15727 (Aug. 17, 1971), which promulgated regulations governing petroleum products as Subpart L of its Phase IV price controls on August 19, 1973, 6 C.F.R. Part 150, Subpart L; 38 Fed.Reg. 22536 (Aug. 22, 1973). In November, 1973, with the passage of the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 *et seq.*, the President established the Federal Energy Office ("FEO") and delegated to that office the functions of the CLC and the new authority contained in the EPAA to implement mandatory pricing and allocation controls. Executive Order 11748; 38 Fed.Reg. 33575 (Dec. 6, 1973). The FEO subsequently reissued the CLC's petroleum price regulations virtually without modification, but in recodified form as 10 C.F.R. Part 212, Subpart E; 39 Fed.Reg. 744 (Jan. 2, 1974); 39 Fed.Reg. 1924 (Jan. 15, 1974). In June, 1974, the Federal Energy Administration ("FEA") succeeded to the functions of the FEO and assumed responsibility for enforcing these CLC pricing regulations. Executive Order 11790; 39 Fed.Reg. 23785 (June 27, 1974). *See generally Standard Oil Co. v. DOE,* 596 F.2d 1029, 1035–36 (TECA 1978); *Northern Natural Gas Co. v. DOE,* 464 F.Supp. 1145, 1148 (D.Del.1979).

In December, 1974, having concluded that the refiner price rules of Subpart E were

1. A wet natural gas stream contains natural gas, ethane and natural gas liquids.

2. The production, sale and marketing of natural gasoline by Distillers and Phillips has not been the focus of DOE enforcement action and is not an issue in this litigation.

not "well suited for regulating prices of liquid products produced from natural gas by gas processors," 39 Fed.Reg. 32718 (Sept. 10, 1974), the FEA promulgated a new Subpart K specifically addressed to the pricing of NGLs and NGL products. 39 Fed.Reg. 4407 (Dec. 24, 1974). Under the new section, transfers of NGL products were characterized as either "first sales" or "net–back sales." A "first sale" was defined as "the first transfer for value to a class of purchaser for which a fixed price per unit of volume is determined." 10 C.F.R. § 212.-162. A "net–back sale" was defined as "any transfer for value to a class of purchaser for which a percentage of the revenues from the first sale of natural gas liquids or natural gas liquid products is received." *Id.* Subpart K further established formulas for computing the maximum allowable selling prices for both first sales and net–back sales. A gas plant operator or owner, such as Distillers, engaged in first sales of NGLs or NGL products could not charge a class of purchaser a price in excess of the weighted average price at which the product was sold in transactions with the class of purchaser on May 15, 1973, with appropriate adjustments made for increased product costs and increased non–product costs as provided by the regulations. 10 C.F.R. § 212.163(a). A gas plant operator or owner engaged in net–back sales could not charge or receive per gallon revenues for NGLs or NGL products in excess of the per gallon revenues received in such net–back sales on May 15, 1973, except to the extent that the first sale price upon which the net–back amount was determined was lawfully increased above its May 15, 1973 level, or to the extent that the method for determining the amount of the net–back was changed. 10 C.F.R. § 212.-163(b).

After the promulgation of Subpart K, both Distillers and Phillips concluded that Distillers' sales of natural gasoline to Phillips, which were made at a fixed price per unit of volume, constituted first sales while Distillers' sales of butane and propane, under which Distillers received a percentage of Phillips' resale revenues, properly could be characterized as net–back sales.[3] With the advent of FEA reporting requirements in July, 1975, Distillers duly advised FEA, and later its successor DOE,[4] in monthly statements, that its sales of propane and butane to Phillips were priced in accordance with the net–back sale price formula. These reports were submitted to FEA, and then to DOE, for three years without challenge.

In August, 1978, the DOE formally notified Distillers that it would audit Distillers' Tuscola gas processing and petrochemical operations and proposed that representatives from Distillers, Panhandle and the DOE meet in a pre–audit conference to discuss the focus of DOE's investigation. During this meeting, on September 15, 1978, DOE enforcement personnel advised Distillers for the first time that it would treat Distillers' sales of propane and butane to Phillips as first sales, and not net–back sales, for purposes of the audit. The DOE representatives emphasized that this was a "preliminary view," Docket Item 4, Exhibit 6, p. 36, and that this conclusion did not represent "a formal interpretation of the Department of Energy," *id.* The DOE representatives further advised Distillers that it could deal with this tentative assessment in one of three ways: (1) Distillers could do

3. Phillips' understanding that Distillers' transfers of propane and butane to Phillips were net–back sales is reflected in a February 13, 1975 letter from Phillips to Distillers which notes that "the FEA regulations effective January 1, 1975 pertaining to a 'percent of resale' type purchases of NGL have been interpreted by our Company to read that Phillips must pay [Distillers] 90% of the Tuscola netback of propane and butane sales . . . ." Docket Item 4, p. 5 and Exhibit 2. On January 22, 1979, after the DOE investigation giving rise to this action had commenced, Phillips reiterated its belief, in a letter to Distillers' counsel, that Phillips' purchases of propane and butane from Distillers were net–back purchases. Docket Item 4, Exhibit 3.

4. The DOE assumed the responsibilities of the FEA in October, 1977 pursuant to the Department of Energy Reorganization Act. 42 U.S.C. §§ 7101 *et seq.; see* Executive Order No. 12009; 42 Fed.Reg. 46267 (Sept. 15, 1977).

nothing, in which case the issue would be reserved until after the audit was completed (at which time the DOE presumably would determine the manner in which the propane and butane sales would be definitively treated); (2) Distillers could give the auditors a "written statement" of its position and if the auditors were not persuaded by the arguments presented therein, the auditors could seek internal guidance from the National Office of DOE; or (3) Distillers could submit a formal Request for Interpretation to the General Counsel of DOE. *Id.* at 39. Distillers elected to pursue the third option, and on November 3, 1978, it submitted a formal Request for Interpretation to the Office of General Counsel pursuant to Subpart F of 10 C.F.R. Part 205. The request sought an interpretation that Distillers' sales of propane and butane to Phillips were net-back sales within the meaning of Subpart K.

Six months after this request was filed, on May 30, 1979, the Economic Regulatory Administration ("ERA") of DOE issued a Notice of Probable Violation ("NOPV") to Distillers which stated that DOE "has reason to believe that during the period September, 1973 through August, 1978, [Distillers] charged prices in excess of those permitted by the applicable regulations." Docket Item 7, Exhibit A, p. 31. These apparent overcharges, estimated by DOE at $72,290,505, were said to have been incurred as a result of Distillers' erroneous classification of its sales of propane and butane to Phillips as net-back sales instead of as first sales. The NOPV further stated that if it was determined that a violation in fact had occurred, Distillers might be ordered to refund to Phillips the amount of the overcharges, plus interest computed in accordance with DOE regulations, and might also be subject to substantial penalties and sanctions, as described in 10 C.F.R. § 205.203. For purposes of assessing these penalties and sanctions, each day that the violation persisted would be considered a separate violation. Docket Item 7, Exhibit A, p. 32.

Shortly after the NOPV was issued, on June 15, 1979, the Assistant General Counsel advised Distillers that because the Request for Interpretation was filed at the time the ERA "was conducting a factfinding investigation of National Distillers" which resulted in the issuance of the NOPV, and "[i]nasmuch as the interpretative process is not intended to serve as an alternative forum for review or 'appeal' of an NOPV, the contentions raised in [Distillers'] Request for Interpretation are properly raised in a response to the NOPV." Docket Item 4, Exhibit 8, p. 1. Accordingly, the Assistant General Counsel concluded that "it would not be appropriate" to rule on Distillers' Request for Interpretation and the request was dismissed. *Id.* at 2.

Distillers commenced this action on August 14, 1979, seeking a declaratory judgment that its sales of propane and butane to Phillips are net-back sales and an injunction against further prosecution of DOE's enforcement action. Immediately prior to filing suit, however, Distillers transferred ownership of its entire NGL products operations to a previously inactive, wholly owned subsidiary incorporated in Delaware, National Hydrocarbons, Inc. Hydrocarbons then joined with Distillers in filing this suit and, by virtue of its incorporation in Delaware, provided the basis for venue in this district. *See* 28 U.S.C. § 1391(e)(4); Docket Item 1, p. 5.

Plaintiffs' complaint advances several grounds in support of its request for relief. Plaintiffs claim that the NOPV issued by the DOE, in substance and effect, constitutes a formal interpretation that Distillers' sales of propane and butane to Phillips are first sales and not net-back sales. As such, plaintiffs argue that the purported "interpretation" is arbitrary, capricious and otherwise substantively defective. Alternatively, if the Court determines that the NOPV is not tantamount to a formal "interpretation," plaintiffs argue that the DOE's refusal to respond to plaintiffs' Request for Interpretation constitutes reviewable final agency action which merits judicial redress. Plaintiffs also challenge the DOE's purported "interpretation" on several procedural grounds which encompass the following allegations: (1) to the extent

DOE's Subpart K purports to exclude from the net-back sale price rule Distillers' transfers of propane and butane to Phillips, those regulations are void because they were promulgated without compliance with the rule-making requirements prescribed by the Administrative Procedure Act, 5 U.S.C. § 553; (2) even if DOE's purported "interpretation" is not substantively infirm: (a) it represents a substantial departure from well-established practices and is invalid because it was promulgated in the absence of notice and comment rulemaking, *id.*; and (b) it can have prospective effect only and is invalid to the extent it is retroactively applied to Distillers; and (3) the penalties and sanctions provided by the EPAA and the corresponding DOE regulations are unconstitutional insofar as they may be applied to Distillers (and similarly situated companies) for conduct occurring prior to a final determination of the legal issues involved in the underlying enforcement proceeding.[5] These procedural issues are necessarily subordinate to the primary question of the validity of DOE's purported "interpretation."[6]

DOE responded to plaintiffs' complaint by filing a motion to dismiss pursuant to Rule 12(b) on the grounds that venue is not proper in this district, that plaintiffs' claims are not ripe for adjudication and that plaintiffs have failed to exhaust their administrative remedies. After considering the various briefs and the oral arguments of the parties, the Court concluded that the DOE had made out a prima facie case that venue was obtained in this district by the collusive joinder of Hydrocarbons as a plaintiff. *See,* 487 F.Supp. 34 (D.Del.1980). The Court held that efforts to manufacture venue could not conscionably be tolerated and that, accordingly, if it were established definitively that Distillers had transferred ownership of its NGL products operations to Hydrocarbons for the sole purpose of creating venue in this district, the Court would be obligated to dismiss the suit. In order to allow plaintiffs a reasonable opportunity to rebut this contention, however, the Court invited them to present documents, affidavits or other pertinent evidence demonstrating that the transfer was not made simply for the purpose of establishing venue in this district.

Both parties have now fully briefed the venue question and have presented evidence in support of their respective positions. The Court decides this issue and the other grounds advanced in support of DOE's outstanding motion to dismiss in this opinion.

II. *Venue*

■ In its February 26, 1980 memorandum opinion, this Court held that venue in federal court is not proper if it has been obtained by means of a collusive joinder of a party. 487 F.Supp. at 37. Because the transfer of Distillers' NGL products operations to Hydrocarbons occurred a mere six days before commencement of this action, the Court found that there were sufficient facts in the record to suggest that the transfer was made for the sole purpose of obtaining venue in this district. *Id.* Rather than make a finding to that effect without the benefit of full factual development, the Court granted plaintiffs a reasonable time in which to demonstrate that the transfer was motivated, at least in part, by other legitimate considerations. *Id.* In response to that invitation, both parties sub-

5. Under statutory and regulatory provisions, plaintiffs could be exposed to civil penalties of $20,000 and criminal penalties of $40,000 for each violation of DOE regulations. 15 U.S.C. § 754(a)(3); 10 C.F.R. § 205.203(b)–(c). In addition, the DOE has taken the position that each day that a violation continues shall be deemed a separate violation for purposes of assessing penalties. 10 C.F.R. § 205.203(a)(2). Plaintiffs' corporate personnel could also be held individually liable for each violation and could be subject to civil and criminal penalties. 15 U.S.C. § 754(a)(4); 10 C.F.R. § 205.203(e).

6. In view of the disposition of defendants' motion to dismiss, the Court need not consider these procedural issues. Plaintiffs will have ample opportunity to receive judicial consideration of these issues if and when this case becomes ripe for judicial review.

mitted memoranda and supporting documentation addressed to the venue question.[7]

Plaintiffs now have presented four justifications for transferring ownership of Distillers' NGL products operations to Hydrocarbons. First and foremost, plaintiffs argue that the transfer represented an attempt to insulate Distillers' non–NGL products operations from the potentially crippling effects of the DOE enforcement action should DOE's position eventually be upheld in court. Plaintiffs argue that under DOE regulations, Distillers could be exposed to substantial sanctions and penalties for each day that a violation of DOE pricing regulations occurred. These penalties would begin to accumulate prior to completion of judicial review and conceivably could total $1,200,000 a day or $438,000,000 a year, a sum which, if fully assessed, could well exceed Distillers' net worth. Accordingly, by transferring Distillers' NGL products operations to Hydrocarbons, Distillers had set the stage for later arguing that any penalties and sanctions for violations occurring subsequent to the transfer can be assessed only against Hydrocarbons and not Distillers, thus leaving Distillers' non–NGL products operations unimpaired. Second, plaintiffs claim that by segregating the books and records of Distillers' NGL products operations in one self–contained entity, plaintiffs have facilitated any further DOE audit of its NGL products business. Plaintiffs' third argument is that the maintenance of independent books and records will protect the confidentially of proprietary information concerning Distillers' ethylene production from third party competitors in rate proceedings before the Federal Energy Regulatory Commission ("FERC"). Thus, Hydrocarbons' records relating solely to the extraction and fractionation operations, when subpoenaed by third parties in FERC proceedings, can be provided without the risk of disclosing other confidential cost data, not pertinent to these processes. Finally, plaintiffs claim that the separation of the extraction and fractionation operations will secure certain advantages for plaintiffs under the Natural Gas Policy Act, 15 U.S.C. § 3301, et seq., by demonstrating in a "graphic" manner that Hydrocarbons' use of natural gas should not be subject to incremental pricing under that Act.

The Court's task in evaluating these justifications has been made difficult by the complete absence of any contemporaneous documents which directly support plaintiffs' contentions or otherwise address the reasons for the transfer of the NGL products operations to Hydrocarbons. The Court is thus constrained to decide this question on the basis of meager and obtuse evidence. Nevertheless, although the issue is not free from doubt, the Court concludes that the plaintiffs have demonstrated a bona fide purpose for the transfer unrelated to the establishment of venue in this district.

Plaintiffs' concern with the possible penalties and sanctions which could be levied upon Distillers in the event it was finally determined that Distillers had violated the pricing regulations was manifest shortly after the NOPV was issued. Within five days after receipt of the NOPV, outside counsel to Distillers prepared and circulated to corporate counsel a memorandum summarizing the civil and criminal penalty provisions of the DOE regulations and suggesting arguments Distillers might interpose to limit

7. The plaintiffs submitted the affidavit of Douglas Allen, a director and Vice President of Hydrocarbons, which outlined the business justifications for the transfer of operations, and the defendants sought and obtained limited discovery on the venue issue, including the deposition of Mr. Allen. In the course of this discovery process, the Court was called upon to examine *in camera* copies of documents requested by DOE which were withheld by plaintiffs under claims of attorney–client and work product privileges. The Court ruled that by basing venue on the joinder of Hydrocarbons, whose interest in this litigation arose only days before suit was filed, plaintiffs had placed in issue the possibility of collusion and, accordingly, had waived their attorney–client privilege with respect to all information bearing on the transfer of Distillers' NGL products operations to Hydrocarbons. Order, June 3, 1980, Docket Item 34. Similarly, the Court found that the defendants had made a sufficient showing of necessity to overcome application of the work product immunity to these same documents. *Id.*

application of such penalties. Docket Item 35, Exhibit 1. In his deposition, Douglas Allen, a director and Vice President of Hydrocarbons, testified that officers of Distillers held approximately three meetings between June and August, 1979 in which the question of potential liability was discussed. Docket Item 29A, pp. 8–9, 14–15. This issue, Allen testified, was Distillers' "primary concern" and provided the motivation for the spin–off of the Tuscola NGL products facilities to Hydrocarbons. *Id.* at 15. This concern persisted unabated through the initiation of this lawsuit and is further reflected in plaintiffs' motion to suspend *pendente lite* application of sanctions and penalties, filed on October 15, 1979. The Court is persuaded that the specter of substantial liability created considerable anxiety among Distillers' management and counsel and the possible mitigation of this liability was an objective of the assignment of Distillers' operations to Hydrocarbons.

Defendants argue with some force that plaintiffs have failed to demonstrate that the survival of Distillers is dependent upon the transfer of the NGL products operations to Hydrocarbons. Defendants contend that liability will be imposed upon Distillers in any event, should a violation be found, either because Hydrocarbons is an alter ego of Distillers or because under DOE regulations, Distillers and Hydrocarbons will be treated as one firm for purposes of assessing penalties. Defendants' arguments mischaracterize the issue. Distillers' attempt to limit its liability may well prove fruitless. It is not necessary, however, for the limited purpose of determining whether venue is proper in this district, that plaintiffs demonstrate the probable success of their efforts; it is sufficient that plaintiffs show that they genuinely believed they could limit their potential liability through the transfer of operations, or at least that they sought to make a persuasive argument that liability should be so limited.

Defendants point to Distillers' 1978 and 1979 Annual Reports as evidence that such a belief did not in fact exist. These documents assert *inter alia* that Distillers and its subsidiary are continuing to sell NGL products in accordance with past pricing practices "which could add to the alleged overcharges and subject them to a claim for additional penalties." 1979 Annual Report, Docket Item 32, p. 25. Nevertheless, the documents also state that "based upon consultations with outside counsel, [Distillers] believes that the pricing of natural gas liquid products . . . was and is in accordance with the regulations and that its position will prevail. Accordingly, the Company has made no provision for liability with respect to this matter." *Id.* at 26. Defendants argue that this optimistic report and plaintiffs' refusal to set up a reserve for the potential penalties and overcharges they could be ordered to pay demonstrate that plaintiffs were not unduly concerned with the possible adverse effects of the enforcement action. This argument is not persuasive. Even if Distillers believed that its pricing practices were valid, it would be remiss if it declined to take protective measures to insure its financial health, should it be proved wrong. That Distillers chose to protect itself by reactivating a defunct corporation and transferring the NGL products operations to that corporation, and did not set up a reserve, does not suggest that it did not perceive the risk of penalties and sanctions as a real threat. Indeed, the establishment of a reserve would have no effect on the amount of penalties that might successfully be assessed against plaintiffs, while transfer of operations to Hydrocarbons presented plaintiffs, at the very least, with an argument that the amount should be limited.

Defendants also argue that plaintiffs' purported justifications are mere post–hoc rationalizations formulated in response to the Court's February 26, 1980 Order. There is evidence in the record to support this contention as to some of those justifications not including the objective of limiting liability.[8] Under the Court's Opinion, how-

8. For example, the documents which the Court ordered produced pursuant to defendants' discovery request indicate that at the time the transfer of operations was made, outside coun-

ever, plaintiffs were required only to demonstrate a single bona fide purpose for transferring their NGL products operations to Hydrocarbons to refute the presumption that the transfer was made for the sole purpose of establishing venue in this district. The Court is persuaded that plaintiffs have demonstrated a legitimate purpose and accordingly, the Court need not examine the sincerity of plaintiffs' remaining justifications.

The Court thus holds that venue is proper in this District.

III. *Ripeness*

DOE contends that plaintiffs' complaint does not present a "case or controversy" ripe for judicial resolution and that review may not be had until the administrative proceedings are completed. Application of the "ripeness" doctrine must be made under the standards enunciated by the Supreme Court in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), wherein the Court determined that judicial scrutiny is available only when the issues are "fit" for decision and the hardship to the parties of withholding review is considerable. *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 149, 87 S.Ct. at 1515. In *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239 (D.Del.1977), *aff'd sub nom. Standard Oil Co. v. DOE,* 596 F.2d 1029 (TECA 1978), this Court had occasion to consider the ripeness doctrine in the context of preenforcement review and there held that under the *Abbott Laboratories* trilogy, a claim is ripe if each of the following factors is satisfied: (1) the issues presented are purely legal; (2) the issues are based on final agency action; (3) the controversy has a direct and immediate impact on the plaintiff's business; and (4) the litigation will expedite final resolution of the controversy rather than delay or impede effective agency enforcement. *Id.* at 1245; *see Pennzoil Co. v. DOE,* 466 F.Supp. 238, 241 (D.Del.1979); *Northern Natural Gas Co. v. DOE,* 464 F.Supp. 1145 (D.Del.1979).

The Court finds that plaintiffs have sufficiently proved the existence of the first factor of the above criteria. The issues framed by the complaint are wholly legal in nature, concerning the application of DOE regulations to uncontroverted facts. Plaintiffs contend that their sales of propane and butane to Phillips are net-back sales within the meaning of the DOE regulations while defendants argue that these sales are properly classified as first sales. The underlying facts upon which these contrasting legal positions are based, however, are not in dispute.

The evidence clearly establishes that plaintiffs sold their propane and butane to Phillips in return for a percentage of the resale revenues of these products, computed under different formulas. Defendants do not argue to the contrary, but insist that the sales of butane and propane "do not fall within the limited purposes of the 'net-back sale' price rule." Docket Item 7, Exhibit A, p. 22. This price rule, defendants argue, was intended to apply only to sales arrangements among producers, royalty owners and gas processors and does not extend to sales of NGL products between marketers and suppliers that occur after fractionation and

sel to Distillers advised Distillers' Assistant General Counsel that the transfer might provide one of Distillers' competitors "with a new vehicle for attacking Distillers and seeking data as to its operations." Docket Item 35, Exhibit 3, p. 3. This letter undercuts plaintiffs' argument that one effect of the transfer would be to insulate Distillers from third party fishing expeditions into its ethylene production data. Similarly, the documents contain a letter from the same outside counsel to company counsel, dated after the court's venue Order, outlining "four potential areas where the corporate separation of the extraction operations from the petrochemical operations could be significant." Docket Item 35, Exhibit 4. This letter describes two of the justifications later advanced by Mr. Allen in his affidavit–the justification mentioned above concerning the protection of Distillers' confidential ethylene production data, and the justification concerning the benefits secured to Distillers under the Natural Gas Policy Act by bifurcating the Tuscola operations. Although it is not entirely clear, the letter appears to be an assessment of post-hoc justifications for the transfer.

are unconnected with gas plant operations. *Id.* Defendants also argue that plaintiffs' sales do not fall within the "literal" definition of net–back sales for two reasons. First, defendants maintain that plaintiffs' sales consist of fractionated NGL products rather than of unfractionated NGL and that the net–back sale price rule extends only to sales of unfractionated NGL. *Id.* at 24. Second, defendants maintain that because Phillips used a weighted average resale price involving more than one class of purchaser in determining the net–back amount due plaintiffs, Phillips' sales cannot constitute first sales and consequently plaintiffs' sales cannot be characterized as net–back sales. *Id.*[9]

The purely legal character of this controversy is self–evident. The Court must determine whether in fact: (1) the net–back sale price rule was intended to apply only to sales of unfractionated NGL, and not fractionated NGL products; (2) whether, by extrapolation, the price rule was intended to apply only to sales arrangements among producers, royalty owners, and gas processors and not between marketers and suppliers engaged in a relationship unrelated to gas plant operations; and (3) whether by determining the net back on the basis of a weighted average resale price involving more than one class of purchaser, Phillips and Distillers have taken the sales of propane and butane out of the net–back sale definition. To resolve these questions, the Court need only examine the language of the pertinent regulations, the history surrounding promulgation of these regulations, and any evidence of the agency's contemporaneous interpretation of the regulations. *See Phillips Petroleum Co. v. FEA, supra,* 435 F.Supp. at 1245. The Court can then fully decide whether the defendants' present construction of the net–back sale price rule and application of that rule to plaintiffs is valid. *Id.* The record in this case thus does not reflect a factual controversy which would be clarified by further administrative proceedings. *See Bethlehem Steel v. EPA,* 536 F.2d 156, 161 (C.A. 7, 1976); *Pennzoil Co. v. DOE, supra,* 466 F.Supp. at 242. Nor does resolution of this litigation require application of DOE's expertise since it is axiomatic that courts are peculiarly suited to decide controlling questions of law. The Court thus finds that the first prong of the ripeness test is satisfied in this case.

█ It is the second prong of the criteria articulated in *Phillips,* the requirement that the issues be based on final agency action, in which this suit runs afoul of the ripeness doctrine. The agency action challenged by plaintiffs, the issuance of the NOPV, fails to satisfy this finality requirement under any conceivable construction.

In *Abbott Laboratories,* the Supreme Court looked to certain factors to determine whether agency action is final, among them whether the action has the "force of law" such that "compliance [is] expected," is "definitive" and not "tentative," is "promulgated in a formal manner," and is not "only the ruling of a subordinate official." *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 151, 87 S.Ct. at 1517; Mezines, 5 Administrative Law § 48.03[1] at 8–9. An NOPV initiates the DOE enforcement process and represents a preliminary assessment that "the ERA *has reason to believe* that a violation has occurred, is continuing or is about to occur." 10 C.F.R. § 205.191 (emphasis added). This very language belies any conclusion that the NOPV is "definitive" and not merely a "tentative" determination.

Moreover, it is undisputed that the NOPV itself is not binding on plaintiffs and does not have the force and effect of law. Before the terms of an NOPV are deemed

9. Under DOE regulations, plaintiffs' sales of propane and butane could qualify as net–back sales only if Phillips' resales of these items were first sales. First sales are, by definition, "transfers for value to *a class of purchaser* for which a fixed price per unit of volume is determined." 10 C.F.R. § 212.162 (emphasis added). In the NOPV, DOE argues that because the resale prices set by Phillips of the butane and propane are determined by a "weighted average price" calculated by reference to *more than* one class of purchaser, Phillips' resales are not first sales, and plaintiffs' sales, therefore, cannot be net–back sales.

final, they receive independent administrative review at three separate levels. After the NOPV is issued, the recipient may file a Reply with the ERA responding to the charges. 10 C.F.R. § 205.191. If, notwithstanding this reply, the ERA still maintains that a violation has occurred, it may issue a Proposed Remedial Order ("PRO") setting forth proposed findings of fact and conclusions of law. 10 C.F.R. § 205.192. This PRO is then published in the Federal Register and the recipient of the NOPV has yet another opportunity to refute the ERA allegations by filing a Notice, and then Statement, of Objections. 10 C.F.R. § 205.193. If such objections are filed, the matter is referred to the Office of Hearings and Appeals ("OHA"), an independent office within DOE, wholly separate from the prosecutorial functions of the ERA, and an adjudicatory proceeding, complete with discovery, evidentiary hearing and/or oral argument is held. 10 C.F.R. § 205.193A–.199A. At the completion of this proceeding, the OHA may adopt the findings and conclusions contained in the PRO, with or without modification, as a final Remedial Order ("RO"), may remand the PRO to the ERA for further action, or may rescind the PRO. 10 C.F.R. § 205.199B.

If an RO is issued, the recipient may file an administrative appeal with the Federal Energy Regulatory Commission, 10 C.F.R. § 205.199C, which insures the recipient two further tiers of review. The RO is first referred to a "Presiding Officer" who receives briefs from both the Secretary of DOE, and the petitioners, allows discovery as needed, and conducts another oral hearing on the issues contained in the RO, if requested. 18 C.F.R. § 1.38. In this proceeding, the Secretary must sustain the burden of proof with respect to all disputed elements of the RO. 18 C.F.R. § 1.38(*l*). The Presiding Officer then issues a decision and proposed order affirming, modifying or vacating the contested RO and files this proposed order and the entire administrative record with the Commission for further independent consideration. 18 C.F.R. § 1.38(m). Petitioners are given a final opportunity to rebut any adverse findings by filing written comments with the Commission. *Id.* The Commission then issues an order which represents the DOE's final position on the matter and is ripe for judicial review. 42 U.S.C. § 7193(c); 18 C.F.R. § 1.38(n).

Under this statutory and regulatory framework, it is clear that an NOPV "has neither an independent coercive effect nor the 'force of law.'" *West Penn Power Co. v. Train,* 522 F.2d 302, 311 (C.A.3, 1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976). Accordingly, under the criteria outlined in *Abbott Laboratories,* the Court finds that the issuance of the NOPV cannot be construed as final agency action.[10]

Plaintiffs offer two theories in support of the proposition that the NOPV properly can be deemed final agency action. Plaintiffs first contend that under the circumstances of this case, the NOPV must be construed as a formal agency interpretation of the net-back sale price rule. In support of this theory, plaintiffs point to the letter of DOE's Assistant General Counsel dismissing plaintiffs' request for interpretation. This letter notes that in the NOPV, "specific legal conclusions are drawn from the application of the pertinent DOE regulations to the same issues raised in [plaintiffs] request . . .," and that accordingly, the issues "are best resolved in connection with the administrative procedures designed specifically for consideration of an NOPV." Docket Item 9, Exhibit B, pp. 1–2. Plaintiffs claim that by deferring to the ongoing enforcement proceeding, the General Counsel's office *sub silentio* adopted the legal conclusions contained in the NOPV and that these

10. Two other courts that have considered the issue similarly have held that an NOPV is not final for purposes of judicial review. *See Diversified Chemicals and Propellants Co. v. FEA,* 432 F.Supp. 859 (N.D.Ill. 1977); *Southwestern States Marketing Corp. v. DOE,* C.A.No. 1–79–54 (N.D.Tex. Jan. 26, 1980). *See also Texaco, Inc. v. DOE, supra,* 490 F.Supp. at 887, *citing approvingly Southwestern States Marketing Corp. v. DOE. But see United Refining Co. v. DOE,* 482 F.Supp. 1131 (W.D.Pa. 1980).

conclusions should be treated as a formal interpretation ripe for judicial review.

Plaintiffs' argument, albeit ingenious, is not supported by the record. The letter from the Assistant General Counsel, by its terms, neither purports to represent an interpretation, nor suggests that the NOPV is to be considered such an interpretation. In fact, the language of the Assistant General Counsel's response unequivocally states that "this letter does not constitute an interpretation," *id.* at 2, and concedes only that in view of the pending enforcement proceeding, "it would not be appropriate for the Office of General Counsel concurrently to address these issues in the context of an interpretation request." *Id.* The Assistant General Counsel's dismissal of plaintiffs' Request for Interpretation, therefore, merely represents a decision to refrain from disturbing the enforcement proceedings, and cannot be read as either an express or tacit adoption of the legal conclusions contained in the NOPV.

Plaintiffs' second argument is that the concept of finality must be given a "pragmatic" construction and, viewed in this light, the NOPV must be deemed final agency action. The NOPV, plaintiffs claim, contains "all the attributes" of an interpretation, and "reaches definite legal conclusions as to the meaning and intent" of the pertinent DOE regulations. Docket Item 9, pp. 12–13. Moreover, the effect of the NOPV plaintiffs argue, is to compel an immediate change in plaintiffs' pricing practices, an impact which is a necessary concommitant only of final agency action. Plaintiffs purportedly are faced with a "Hobson's choice"–they can either abandon their present pricing practices respecting sales of propane and butane to Phillips during the pendency of the enforcement proceeding, which will result in a loss of millions of dollars that may never be recovered, or they can continue to sell to Phillips under current pricing arrangements, and risk DOE action requiring substantial refunds, and civil and criminal penalties. Accordingly, plaintiffs contend that measured by both its terms and impact, the NOPV must be considered final agency action.

This Court recognizes that "the cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." *Abbott Laboratories, supra,* 387 U.S. at 149, 87 S.Ct. at 1516. But even under this flexible approach, plaintiffs' arguments cannot prevail. An NOPV lacks two significant attributes of an interpretation. First, as discussed earlier, an NOPV contains only preliminary conclusions of law which cannot be enforced and which are amenable to alteration or rescission at any time during three stages of administrative review. In contrast, a formal interpretation is binding on the parties to the interpretation proceeding. *See Atlantic Richfield Co. v. FEA,* 556 F.2d 542, 551 (TECA 1977). Second, the initial legal conclusions contained in an NOPV are formulated by enforcement officials of DOE while a formal interpretation may be issued only by the General Counsel, his delegate or a Regional Counsel.[11] The fact that the NOPV in this case provided a non–binding analysis of the legal issues underlying this controversy, therefore, cannot turn it into a formal and final agency interpretation.

Plaintiffs' contention that the NOPV must be construed as final agency action because of its purported coercive impact similarly is without merit. The short answer to this argument is that Congress expressly provided for both the penalty provisions for violating DOE regulations, *see* § 5(a)(3) of the EPAA, 15 U.S.C. § 754(a), and the procedures for seeking judicial review of agency enforcement action, which

11. Plaintiffs argue that by choosing to defer to the ongoing enforcement proceeding, the General Counsel, in effect, delegated his authority to issue an interpretation to the ERA, and the NOPV, accordingly, is reviewable as an interpretation. As discussed previously, there is no evidence in the record to support this contention. Moreover, the administrative history of the regulations governing interpretations reveals that the purpose of this delegation authority was to allow the Assistant General Counsel for Interpretations to rule on interpretation requests. *See* 43 Fed.Reg. 2730 (Jan. 19, 1978).

allow such review only when the Commission has issued a final binding order, *see* § 503 of the DOEOA, 42 U.S.C. § 7193(c). Thus, notwithstanding the possible impact of the provisions governing civil and criminal penalties and sanctions, the Congress specifically chose not to make an NOPV immediately reviewable. Accordingly, even if plaintiffs' claims of hardship are accurate, this Court cannot ignore the clear statutory mandate that enforcement proceedings are final only after the Commission has issued a binding order.

Furthermore, the Court questions whether impact alone could justify a finding of finality in this case. Although plaintiffs are undoubtedly faced with some uncertainty respecting their future pricing policies, they are under no present obligation to do anything, there is no immediate and substantial threat of sanctions or expected conformity to any final statutory directive, and it is distinctly possible that plaintiffs may prevail at the administrative level and their nightmare scenario respecting penalties may never come to pass. *See Toilet Goods Ass'n v. Gardner, supra,* 387 U.S. at 154, 87 S.Ct. at 1518; *Bethlehem Steel Corp. v. EPA,* 536 F.2d 156, 163 (C.A.7, 1976); *Texaco, Inc. v. DOE,* 490 F.Supp. 874, 889 (D.Del. 1980). Thus, this case is unlike those cited in plaintiffs' briefs, in which the complaining parties were confronted with undisputedly *final* agency action threatening immediate penalties for non–compliance and irreparable adverse consequences. *See e. g., Abbott Laboratories, supra*; *A. O. Smith v. F.T.C.,* 530 F.2d 515 (C.A.3, 1976); *Pennzoil Co. v. DOE, supra*; *Northern Natural Gas Co. v. DOE, supra*; *Phillips Petroleum Co v. FEA, supra.*[12] Additionally, plaintiffs' alleged dilemma is indistinguishable from the situation confronting any recipient of an NOPV. To hold that this factor is sufficient to make an NOPV final agency action would be to invite any disgruntled recipient to end–run agency procedures and seek immediate judicial review of preliminary agency findings. This would frustrate the statutory scheme devised by Congress and open the federal courts to a flood of unnecessary litigation. *See Texaco, Inc. v. DOE, supra,* 490 F.Supp. at 889. Accordingly, the Court concludes that "the issuance of [the] NOPV is not such final agency action as will support judicial review." *Southwestern States Marketing Corp. v. DOE,* C.A. No. 1–79–54 (N.D.Tex. Jan. 26, 1980), slip op. at 4.

Because the Court finds that the essential requirement of final agency action is lacking in this case, it is not necessary to decide whether the two remaining prerequisites for judicial review under *Phillips*–the requirement that the controversy have a direct and immediate impact on the plaintiffs' business and that the litigation expedite resolution of the controversy rather than impede or delay effective agency enforcement–are satisfied.[13]

The Court thus concludes that the issuance of the NOPV does not constitute

12. Plaintiffs argue that this case is not unlike several recent energy cases decided in this district in which the Court held that the issues were ripe for judicial determination. *See Pennzoil Co. v. DOE,* 466 F.Supp. 238 (D.Del. 1979); *Northern Natural Gas Co. v. DOE,* 464 F.Supp. 1145 (D.Del. 1979); *Phillips Petroleum Co. v. FEA,* 435 F.Supp. 1239 (1977). Like the instant litigation, these cases presented purely legal issues for review. In each decision, however, the Court was confronted with agency action which was unequivocally final. In *Northern Natural Gas Co. v. DOE,* plaintiffs challenged regulations promulgated pursuant to notice and comment rulemaking. In that case, both parties agreed the regulations were "final, binding and enforceable against the plaintiffs." 464 F.Supp. at 1154. In *Pennzoil Co. v. DOE,* at issue was a DOE ruling of general applicability, the finality of which was conceded both by DOE attorneys at oral argument and by the Acting General Counsel of DOE in response to a proposed rulemaking petition submitted by the plaintiff to rescind the ruling. 466 F.Supp. at 242. In *Phillips Co. v. FEA,* plaintiffs challenged an FEA interpretation of agency regulations which the FEA conceded was "not . . . likely to be overturned . . . during the course of any administrative hearing." 435 F.Supp. at 1246. These cases thus are easily distinguished from the present litigation.

13. The Court has already indicated, however, that it would be difficult for plaintiffs to make out a case of direct and immediate hardship under these facts.

final agency action, with the result that the issues therein raised are not ripe for judicial review. Consequently, this action may not properly proceed in this Court.

Plaintiffs have proposed one other means by which judicial review of this litigation may be obtained. Plaintiffs contend that the General Counsel, or his delegate, was obligated both by statute and DOE regulations to issue a written interpretation in response to plaintiffs' request and that this "failure to act" constitutes judicially reviewable agency action. Defendants respond by arguing that under DOE regulations, the power to issue an interpretation is discretionary and, therefore, the General Counsel's Office properly could refuse to answer such a request.

The Economic Stabilization Act, which plaintiffs cite in support of their argument, states that "any agency authorized . . . to issue rules, regulations, or orders under this title shall, in regulations prescribed by it, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, or rescission of, or . . . exception or exemption from such rules, regulations and orders." 12 U.S.C. § 1904 note. This statutory provision, on its face, does not compel the conclusion that a request for interpretation must receive a responsive answer in *every* instance, and plaintiffs have referred the Court to no legislative history or judicial decision which holds to the contrary. Consequently, the Court cannot conclude on the basis of the sparse information available that the General Counsel is obligated to issue an interpretation in each and every situation where one is sought.[14]

Moreover, it is well settled that in the absence of express statutory constraints, administrative agencies are free to choose the manner in which they will promulgate substantive policies, so long as the choice of methods does not transgress due process. *See NLRB v. Bell Aerospace*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed.2d 1995 (1947). Although these cases have focused almost exclusively on the alternatives of formulating agency policies either through rulemaking or through ad hoc adjudication, there is no principled basis for not equally applying this rule in this context, where the agency has a choice of proceeding either through issuance of a formal interpretation or through enforcement action. *A fortiori*, where an investigation preceding formal enforcement action has already commenced at the time a Request for Interpretation is sought, the agency should be able to permit the investigation to run its course.

Additionally, imposing such a hard and fast rule requiring the General Counsel to issue interpretations in each instance where a request is filed would have undesirable consequences. As defendants correctly note, any subject of administrative investigation or recipient of an NOPV could then file a Request for Interpretation after the commencement of enforcement proceedings, seek immediate judicial review of this interpretation and "stop the agency in its tracks at an early stage of proceedings." *Southwestern States Marketing Corp. v. DOE*, *supra*, slip op. at 3. This result could effectively eliminate the enforcement proc-

14. The parties' briefs on this issue have centered on the meaning of a DOE regulation providing that after consideration of the Request for Interpretation and other relevant information received or obtained, "an interpretation *may* be issued . . . ." 10 C.F.R. § 205.85(a) (emphasis added). Defendants claim that the use of the word "may" clearly establishes that the power to issue an interpretation is discretionary. Plaintiffs respond that the language of this regulation was only recently changed, in 1978, from "shall" to "may" during the course of a rulemaking designed to make other substantive amendments in the regulations. Accordingly, plaintiffs argue that the substitution was not intended to have substantive effect. The Court declines to enter this semantic quagmire. The regulations are not sufficiently clear to compel the conclusion that the General Counsel's office was obligated to respond to plaintiffs' Request for Interpretation, and to engage in tortured readings of ambiguous phrases would be an exercise in futility.

ess as a forum for developing and implementing substantive policy.

■ The Court thus holds that where an investigation giving rise to an enforcement proceeding, or the enforcement proceeding itself, is underway, the DOE has discretion to dismiss requests for interpretation bearing on the exact same legal issues which are the focus of the pending investigation or enforcement proceeding. By this reasoning, the Court does not purport to favor the development of substantive policy through enforcement proceedings when the issuance of a formal interpretation would expedite resolution of the underlying legal controversy and facts are not in dispute. Indeed, in this case it would have been a relatively simple exercise for the General Counsel's Office to decide the purely legal issues presented by plaintiffs' request. The Court simply holds that in these narrowly defined circumstances, the agency is not obligated, as a matter of law, to issue a formal interpretation.

One cautionary note must be added, however. The Request for Interpretation presented in this case was submitted at the suggestion of DOE enforcement personnel in the early stages of a proposed audit. In at least two other instances, the DOE has indicated that a recipient of an NOPV who desires a final determination of legal issues involved in the enforcement proceeding, prior to completion of agency review of the NOPV, may seek a formal interpretation from the General Counsel's Office. *See Shell Oil Co.*, 3 DOE ¶ 80,138 (March 9, 1979); *Shell Oil Co.*, 3 FEA ¶ 80,545 (Jan. 6, 1976). The Court recognizes that there are serious fairness problems inherent in putting a party through the legal expense and effort of filing a Request for Interpretation when the agency has no intention of issuing one. Perhaps this problem can be eliminated by better communication between the separate offices of DOE. If this situation were to recur continuously, however, a court faced in the future with these same facts might very well conclude that it was an abuse of discretion for the agency not to issue a final interpretation on the purely legal issue central to the case.

For the reasons expressed herein, the Court finds that this case is not ripe for judicial review.

IV. *Exhaustion of Administrative Remedies*

■ The Court also concludes that plaintiffs' complaint must be dismissed for failure to exhaust administrative remedies. The purposes of the exhaustion doctrine are multifold. "A primary purpose is, of course, the avoidance of premature interruption of the administrative process." *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). The doctrine also allows the agency to apply its expertise in the area in which it is charged with developing and implementing policy. *Id.* at 194, 89 S.Ct. at 1662; *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). Equally important considerations are the policies of promoting administrative integrity and independence, and preventing unnecessary litigation. As stated by the Supreme Court:

> A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

*McKart v. United States, supra*, 395 U.S. at 195, 89 S.Ct. at 1663.

The Department of Energy Reorganization Act requires that a recipient of an NOPV first exhaust administrative remedies before seeking judicial relief. Under § 503 of that Act, a reviewing court cannot entertain a suit challenging DOE enforcement action until the FERC has issued a

final order. 42 U.S.C. § 7193(c).[15] DOE regulations similarly provide that an appeal to the FERC must be taken of a remedial order as a prerequisite to judicial review. 10 C.F.R. § 205.199C(e). Because the FERC has not yet issued such a final order, the Court's inquiry is at an end.

Furthermore, even if exhaustion were not mandated by statute, the Court would not find as a matter of judicial discretion that it was unnecessary in this case. As discussed earlier in this opinion, the relevant statutes and DOE regulations have established a comprehensive process for determining when violations of DOE pricing regulations have occurred. During this process, which entails consideration by four separate offices of DOE, the agency may at any time decide that its initial legal interpretation is erroneous and modify or withdraw the NOPV. Accordingly, the salutary purposes of allowing the agency the opportunity to discover and correct its own errors and of avoiding premature litigation will be served if the administrative process is free to run its course, unencumbered by piecemeal judicial review.

The Court finds that plaintiffs' action is further barred by their failure to exhaust their administrative remedies.

*Conclusion*

An order will be entered dismissing the complaint on the grounds that it is not ripe for adjudication and plaintiffs have failed to exhaust their administrative remedies.

---

**15.** Section 503 provides that the decision of the FERC "affirming, modifying, or vacating the Secretary's remedial order, ... shall, for the purpose of judicial review, constitute a final agency action ...." 42 U.S.C. § 7193(c).