**CITIES SERVICE COMPANY, Plaintiff,**

v.

**DEPARTMENT OF ENERGY and Charles W. Duncan, Jr., Secretary of Energy, Defendants.**

Civ. A. No. 80–203.

United States District Court,
D. Delaware.

Aug. 28, 1981.

William O. Lamotte, III, and William T. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; Rene P. Lavenant, Jr., and Sim Lake, Fulbright & Jaworski, Houston, Tex.

Joseph J. Farnan, Jr., U. S. Atty., and John X. Denney, Jr., Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., Nancy C. Crisman, David A. Engels, Judith A. Mather, and Frank Massengale, Dept. of Energy, Washington, D. C., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Cities Service Company ("Cities") brought this action against the Department of Energy ("DOE") and the Secretary of Energy seeking a declaratory judgment that certain types of matching purchases and sales of crude oil, which Cities avers were accomplished for the purpose of reducing its costs of obtaining crude oil and refining it into petroleum products, were lawful transactions under DOE's crude oil allocation and pricing regulations and that Cities' accounting for and reporting of these transactions was in conformity with the regulations. Cities also seeks a judgment declaring a DOE interpretation relating to these transactions "plainly erroneous" and inconsistent with DOE regulations, as well as preliminary and permanent injunctive relief barring DOE from bringing any civil, criminal or administrative proceeding against Cities which would be based on a theory that Cities' conduct in these transactions violated the allocation and pricing regulations. Now before the Court are Cities' motions for summary judgment

and preliminary injunction and DOE's motion to dismiss. Before proceeding to consideration of these matters, it will be helpful to briefly describe the pertinent regulatory framework, the nature of the transactions at issue, and the procedural history of this case.

*Regulatory Framework*

Federal controls over the pricing and allocation of petroleum products are traceable to August 1973 when the Cost of Living Council adopted detailed regulations setting maximum prices for certain domestic crude oil.[1] These regulations established a ceiling on the price of so-called "old oil," which was defined as the amount of oil historically produced from a particular "property." To encourage increased domestic production, however, quantities of oil in excess of historical production patterns at a given property—"new oil"—could be sold at market prices. These regulations also restricted prices refiners could charge for refined petroleum products by freezing historic profit margins and permitting refiners to pass through to their customers only their increased costs. In January 1974 regulations were adopted freezing historic supplier-purchaser relationships.

The freezing of existing supplier-purchaser relationships and the control of domestic crude oil prices caused severe dislocation in the American oil industry when the cost of imported crude oil rose sharply as a result of the Arab Oil Embargo and price-fixing by the OPEC cartel. The result was that refiners who relied primarily on domestic, price-controlled crude oil had much lower costs than those who relied primarily on ever more expensive imported crude oil. The Federal Energy Administration in November 1974 promulgated the "entitlements program" in an effort to alleviate the disparities in costs of crude oil found among American refiners.

The general outlines of the entitlements program may be briefly described.[2] The purpose of the program was to enable all refiners and marketers to share equally in the cost benefits of price-controlled domestic crude oil and the cost burdens of more expensive uncontrolled domestic crude oil and imported crude oil. Under the program a refiner was required to have an "entitlement" for each barrel of "old oil" it refined during a particular month. All refiners were issued for a given month an amount of entitlements equal to their proportionate share of old oil refined nationwide during that month. Refiners who refined old oil in a proportion greater than the national average were then required to purchase entitlements from refiners who had refined a disproportionately small volume of old, price-controlled oil. The regulations required a refiner who purchased entitlements to include the value of those entitlements in its costs for crude oil, while a refiner who sold entitlements was required to exclude from his crude oil acquisition costs the value of the entitlements sold. The general effect of these purchases and sales of entitlements was to "basically equalize[ ] the average weighted crude oil costs of all refiners, thereby eliminating the inequities caused by the 'two-tier' pricing system." *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391, 1395 (Temp.Emer.Ct.App.1975) (footnote omitted). Although the details are not important for present purposes, "new oil" was also eventually subjected to controls, thus creating a three-tiered pricing system for domestic oil. As a result, companies which refined disproportionate quantities of "new oil" also incurred entitlements obligations, but at a lower level than with "old oil." In addition to "old oil" and "new oil," there remained certain categories of oil, such as Alaska North Slope crude oil and "stripper" crude oil (produced from a prop-

1. *See* 38 Fed.Reg. 22536 (August 22, 1973), codified with subsequent amendments at 6 C.F.R. § 150.351 *et seq.* These and subsequent regulations were issued by authority of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, and the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.*

2. The regulations embodying the entitlements program are codified at 10 C.F.R. § 211.67 (1980).

erty producing less than 10 barrels per well per day), that were free from controls and exempt from the entitlements requirements.

President Reagan, on January 28, 1981, signed an Executive Order exempting all crude oil and refined petroleum products from the price and allocation controls. *See* Exec.Order No. 12,287, 46 Fed.Reg. 9909 (1981). Therefore, the above-described regulations do not apply to any future transactions Cities or other refiners may engage in.

*The Transactions at Issue*

Faced with this complex regulatory framework, Cities entered into a series of similar transactions which were designed to lower its costs of obtaining its refinery feedstock requirements. The substance of these transactions was that Cities would purchase a quantity of non-controlled crude oil, and, in a reciprocal transaction, would sell a similar quantity of controlled "old" or "new" crude oil to its trading partner. The legal question upon which the economic benefit of these transactions hinged was whether Cities was free to refine the oil it received from its trading partners without incurring entitlements obligations. Ordinarily under the regulations a seller of crude oil was required to certify to his purchaser the quantities of new and old oil included in the crude oil transferred. *See* 10 C.F.R. § 212.131. The purchaser then incurred entitlements obligations to the extent that he purchased and refined "old" oil. However, in order to avoid undue complexity, an exception was carved out from the rule to permit refiners to engage in so-called accommodation sales, whereby two refiners engaged in matching sales or exchanges of crude oil in which only the location of the oil and its quality were taken into account in calculating the exchange ratio. *See* 10 C.F.R. § 211.67(g). Thus if Refiner A exchanged 1000 barrels of new oil to Refiner B for 1000 barrels of old oil,

and the location and quality of the oil were the only factors taken into account, Refiner A would for entitlements purposes treat the old oil he received from B as if it were new oil. B, on the other hand, would treat the new oil he received from A as old oil, and would therefore incur entitlements obligations when the oil was refined to the same extent as if he had refined the oil he sold to A. According to Cities, its matching sales transactions were not governed by 10 C.F.R. § 211.67(g) because the quality and location of the oil were not the only factors taken into account in calculating the exchange ratio. Rather, the determinative factor was the oil's classification, *i. e.*, what entitlements obligations, if any, would be incurred when the oil was refined.

Cities objective in this action is to establish that in the transactions at issue it acted in conformity with the regulations by exchanging certifications with its trading partners.[3] The economic advantage to Cities of these transactions and the exchange of certifications involved can best be understood by examining an apparently typical transaction detailed by Cities in one of its briefs.[4] In December 1979 Cities purchased 974,622.39 barrels of Alaskan North Slope crude oil at $16.25 per barrel. In a reciprocal transaction, Cities, in December 1979, and January and February 1980, sold to its trading partner 970,803.91 barrels of West Texas sour crude oil at $9.18 per barrel. Cities certified to its trading partner that 60% of the West Texas sour crude was lower tier or "old oil" and that 40% was upper tier or "new oil." Cities received a certification from its trading partner that the Alaskan oil was oil that had passed through the Trans-Alaska pipeline and was therefore exempt from the entitlements program. On its face it would appear that Cities lost money in this transaction because it paid $6.9 million more for the oil it

---

**3.** Cities' complaint indicates that it is seeking a declaration that transactions "of the type" described in the complaint complied with DOE's crude oil allocation and pricing regulations. Complaint (Doc. No. 1) ¶ 34. Cities' Amended Prayer for Relief (Doc. No. 45) similarly refers

to the "transactions at issue" and the "transactions described" in its complaint without stating to what specific transactions the judgment it seeks would extend.

**4.** *See* Doc. No. 30 at 9–11.

bought than it received for the equivalent amount of oil it sold. However, if Cities had retained the West Texas sour crude and refined it, it would have incurred entitlements obligations of some $19.8 million. Cities therefore effected a net savings of $12.9 million, assuming that its interpretation of the regulations, under which it would incur no entitlements obligations by refining the Alaskan North Slope oil purchased, was correct.[5] On the other hand, if Cities erroneously exchanged certifications with its trading partner, it was still obligated to purchase entitlements when it refined the Alaskan North Slope oil.

*Procedural History*

This action was filed on April 28, 1980. Thereafter, Cities filed a motion for preliminary injunction and DOE filed a motion to dismiss. In addition, on August 15, 1980, Cities submitted to DOE a request for a formal interpretation relating to the legal questions presented in this lawsuit.[6] On September 24, 1980, the Court stayed consideration of all pending motions pursuant to a stipulation by which DOE agreed to issue a formal interpretation in response to Cities' request.[7]

Cities' request for interpretation[8] outlined the terms of a proposed matching purchase and sale transaction, similar to the one described above, whereby Cities would sell a quantity of controlled old oil and new oil and would purchase from its trading partner a similar quantity of uncontrolled stripper crude oil. In its request Cities indicated that the reason for entering into the transactions was its belief that it could significantly reduce its costs of crude oil needed for refining purposes by purchasing and processing oil that would not require the purchase of entitlements. Cities asked

DOE to confirm that the outlined transaction, when and if consummated, should be reported as follows:

1. Cities should exclude from its crude oil receipts the actual volumes of crude oil traded away and should include in its crude oil receipts the volumes of crude oil actually received and retained for refining.

2. Cities should exclude from its costs of crude oil, the cost of the volumes of crude oil actually traded away and include in its crude oil receipts the price paid for the volume crude oil actually received and retained for refining.

3. Cities should certify its sales pursuant to 10 C.F.R. § 212.83, Cities should carry over these adjustments to its volumes and costs of crude in the "Q" factor and the "C" factor in the calculation of the "A" factor of the price formula.

Finally, Cities requested confirmation that the transaction was governed by the refiners price rule, Subpart E of 10 C.F.R. Part 212, rather than Subpart L, the rule relating to resales. On November 13, 1980, DOE issued Interpretation 1980–43, which at best provided equivocal responses to Cities' inquiry. DOE asserted that many facts relating to the proposed transaction were unclear, and concluded that "the question of whether the proposed reciprocal sales agreement constitutes a lawful matching purchase and sale transaction in which a differential factor other than quality and location will be given effect, cannot be addressed within the narrow parameters of the interpretive process." DOE then referred to a series of statutes and regulations which potentially might be violated

---

5. According to Cities its trading partners also had an economic incentive to enter into these transactions because they could use the price-controlled oil purchased from Cities for non-refining uses to which no entitlements obligations attach. Public utilities, for example, apparently use crude oil directly in the generation of electricity without incurring entitlements obligations in the process. *See* Doc. No. 30 at 56 n.20.

6. This request for interpretation had been originally filed by Cities on June 11, 1980. On July 24, 1980, DOE dismissed that request on the ground that it would be inappropriate to consider the issues presented while they were the subject of litigation in this Court.

7. *See* Doc. No. 20.

8. *See* Doc. No. 24, App. A & B.

depending upon the unknown facts of the transaction. Cities, in its motion for summary judgment,[9] seized upon one statement in particular regarding possible regulatory problems, and asks that it be declared plainly erroneous and inconsistent with DOE regulations:

> For example, if one party to an alleged matching purchase and sale transaction receives an unexplained discount from the market price of uncontrolled domestic crude oil, while selling its own controlled domestic crude oil at its maximum lawful price, the difference between the uncontrolled crude oil's market value and the discounted price could be extra consideration above the maximum price for the controlled crude oil.

Interpretation 1980–43 at 6. Although declining to address the lawfulness of the particular transaction presented, DOE concluded that

> in a lawful matching purchase and sale or exchange transaction in which a differential other than quality and location is given effect in the computation of an exchange ratio, the actual volumes and costs of crude oil given up by one party to the transaction may be excluded from the firm's crude oil receipt and costs, and the actual volumes and costs of the crude oil received by that party may be included in the firm's crude oil receipts and costs. However, the lawfulness of Cities' proposed reciprocal sales agreement with Firm X cannot be determined in the interpretive process.

DOE Interpretation 1980–43 at 8 (Appendix to Doc. No. 24). Thus DOE did nothing more than mouth the substance of one of its regulations[10] without taking a position regarding its applicability to Cities proposed transaction.

---

**9.** Doc. No. 21.

**10.** 10 C.F.R. § 211.67(g) provides in pertinent part that

> in any exchange of crude oil in which only quality and location differentials are given effect in the calculation of the exchange ratio, or in any matching purchase and sale transaction which has the same effect as such an exchange, no volumes of domestic crude oil shall be deemed to have been trans-

Understandably, Cities, after having been promised an interpretation "responding to the merits" of its request, was dissatisfied with this ambiguous ruling. It therefore moved for summary judgment and proceeded to briefing on that motion and its prior motion for preliminary injunction. DOE, likewise, continued with briefing on its motion to dismiss.

The Court will now turn to DOE's arguments that no justiciable case or controversy exists between the parties and that the claims raised by Cities are in any event not ripe for judicial review.

*Principles of Justiciability*

DOE makes discrete arguments relating to the existence of an Article III case or controversy and the ripeness for judicial review of the claims raised by Cities. The Court agrees that there are substantial problems regarding the justiciability of Cities' claims, but has some difficulty in focusing separately on the questions of case or controversy and of ripeness.

■ The requirement of Article III that a plaintiff demonstrate the existence of a "case or controversy" is often more easily stated as an abstract principle than applied to particular situations. In a declaratory judgment action such as this, the basic requirement is that the plaintiff allege facts which, "under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). A plaintiff who challenges a law or government policy must allege that he " 'has sus-

---

> ferred. Any volumes of domestic crude oil exchanged away or sold pursuant to any such exchange or matching purchase and sale transaction shall be considered as having been retained by the refiner or other firm that has so exchanged away or sold such volumes, regardless of the volume of crude oil received or purchased by that refiner or other firm in such exchange or transaction.

tained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. . . . The injury or threat of injury must be both 'real and immediate,' not 'conjectural or hypothetical.' " *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). A plaintiff need not always await enforcement in order to challenge a statute or official policy, *see Pierce v. Society of Sisters*, 268 U.S. 510, 536, 45 S.Ct. 571, 574, 69 L.Ed. 1070 (1925), but a case or controversy does not arise unless there is a real and immediate threat that the statute or policy will in a concrete manner interfere with the plaintiff's rights or otherwise subject him to significant harm. *See United Public Workers v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 564–565, 91 L.Ed. 754 (1947); *cf. Boyle v. Landry*, 401 U.S. 77, 80–81, 91 S.Ct. 758, 759–760, 27 L.Ed.2d 696 (1971) (plaintiffs could not challenge state criminal statutes absent indication that they would suffer irreparable injury were state left free to enforce statutes in normal manner).

■■ The ripeness doctrine, which permits courts to avoid making premature and perhaps unnecessary decisions, is both a constitutional doctrine and a court-made prudential doctrine. In part, the ripeness doctrine, like the related doctrines of standing and mootness, is a facet of the case or controversy requirement of Article III. A plaintiff challenging a governmental enactment or policy satisfies the ripeness aspect of the case or controversy requirement by demonstrating that operation of the enactment or policy will cause him to sustain some immediate injury and that the judicial relief requested would redress this injury. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978). A particular case is ripe in the constitutional sense if "the requisite injury is in sharp enough focus and the adverseness of the parties concrete enough to permit a court to decide a real controversy and not a set of hypothetical possibilities." *Martin Tractor Co. v. Federal Election Commission*, 627 F.2d 375, 379 (D.C.Cir.1980).

■■ Even if a case satisfies the minimum constitutional requirements, there is a broader prudential aspect of the ripeness doctrine which has grown out of the courts' inherent discretion in determining whether to grant injunctive and declaratory relief. When this doctrine is applied in the context of preenforcement review of agency action, its purpose "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *see Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). Resolution of a ripeness issue at the prudential level requires evaluation of the fitness of the issues presented for judicial decision and of the hardship that would be caused the parties if judicial consideration was deferred. *See* 387 U.S. at 149, 87 S.Ct. at 1515. This Court has had the opportunity to examine the ripeness doctrine on a number of recent occasions, and has held, in accordance with the *Abbott Laboratories Trilogy*, that a claim is ripe for preenforcement review if each of four factors is present: (1) the issues presented are purely legal; (2) the issues are based on final agency action; (3) the controversy has a direct and immediate impact on the plaintiff's business; and (4) the litigation will expedite final resolution of the controversy rather than delay or impede effective agency enforcement. *Phillips Petroleum Co. v. FEA*, 435 F.Supp. 1239, 1245 (D.Del.1977), *aff'd sub nom. Standard Oil Co. v. DOE*, 596 F.2d 1029 (Temp.Em.Ct.App.1978); *see National Distillers and Chemical Corp. v. DOE*, 498 F.Supp. 707, 715 (D.Del.1980); *Texaco, Inc. v. DOE*, 490 F.Supp. 874, 887 (D.Del.1980); *Pennzoil Co. v. DOE*, 466 F.Supp. 238, 241 (D.Del.1979); *Northern Natural Gas Co. v. DOE*, 464 F.Supp. 1145, 1154 (D.Del.1979).

A comparison of the above prudential ripeness factors with the standards for determining whether a case satisfies the ripeness aspects of the constitutional case or controversy requirement demonstrates there are substantial similarities between the two inquiries. Specifically, the constitutional requirement that the plaintiff be faced with some immediate or certain future injury overlaps with the prudential prerequisite for preenforcement review that the controversy have a direct and immediate impact on the plaintiff's business, such impact in the administrative agency context being in the form of facing the unhappy choice of complying with agency action believed to be invalid or risking criminal and substantial civil penalties. Similarly, the constitutional requirement that there be concrete adversity between the parties is related to the rule that there may be preenforcement review only of final agency action. On the other hand, consideration of whether the issues presented are purely legal, and whether adjudication will expedite resolution of the controversy rather than delay or impede effective agency enforcement, appear to be uniquely relevant to a determination of whether judicial review should be deferred as a matter of discretion and prudence.

It is no doubt often difficult to determine when the facts of a particular case require a court to cross the line from dismissal as a matter of judicial prudence and discretion to dismissal as a constitutional mandate. That difficulty may in part explain why there are many cases which have been dismissed as unripe without any indication whether the decision was based on constitutional or prudential considerations. For the reasons explained below, this Court is satisfied that facts of this case require that it be dismissed on both constitutional and prudential grounds.

*Concrete Adversity and Final Agency Action*

■ The Article III requirement of concrete adversity between the parties and the prudential limitation on judicial review to final agency action serve similar purposes, among them, the avoidance of judicial decisions on hypothetical or abstract issues.[11] This case is nonjusticiable because there is neither concrete adversity, nor is review sought of agency action that may be characterized as final.

The absence of concrete adversity is evident from the fact that Cities seeks to have the Court interpret regulations which do not require it to do anything and which it does not challenge as being unlawful. Rather, Cities has structured a series of transactions in a manner which it contends is consistent with DOE regulations, and now seeks judicial confirmation that the transactions were lawful. The constitutional barrier to judicial intervention at this juncture, however, is that DOE, the agency charged with promulgating and enforcing the regulations, has never taken the position that Cities has violated these regulations. To the contrary, DOE has expressly declined to take a final position regarding the lawfulness of Cities' transactions. DOE may eventually take the position that Cities' transactions fully complied with the regulations, or, even if DOE concludes that Cities' transactions were in some manner at variance with the regulation, it might elect not to commence an enforcement action. Nor can this Court know what interpretation DOE might attach to the regulations at issue or upon what specific aspects of these transactions DOE might focus in finding a violation. In these circumstances Cities has not satisfied the requirement that its dispute with DOE "not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952). In short, what Cities seeks is judicial insurance against the possibility that DOE might someday bring

11. *Compare United Public Workers v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 564–565, 91 L.Ed. 754 (1947), *with Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–52, 87 S.Ct. 1507, 1515–1517, 18 L.Ed.2d 681 (1967).

an enforcement action against it. To do so, however, would require this Court to render an advisory opinion that Cities complied with the regulations simply because Cities speculates that DOE might eventually allege that Cities violated the regulations.

■ For much the same reasons, the interpretation challenged by Cities cannot fairly be described as final agency action. Although the courts are to approach the question of finality in a "pragmatic" and "flexible" manner, *Abbott Laboratories v. Gardner, supra*, 387 U.S. at 149–50, 87 S.Ct. at 1515–16, agency action is not final unless "rights or obligations have been determined or legal consequences will flow from the agency action." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).[12] Any fair reading of Interpretation 1980–43 requires the conclusion that it neither determined rights or obligations of Cities, nor will any legal consequences flow from it. The interpretation at no point states that Cities' transactions were not consistent with the regulations; to the contrary, the interpretation specifically stated that the lawfulness of the particular transaction outlined in Cities' interpretation request "cannot be determined in the interpretive process." The one statement in the interpretation specifically challenged by Cities suggested that if a refiner, in a matching purchase and sale, sold domestic crude oil at its maximum lawful price, and received an unexplained discount from the market price on the uncontrolled crude oil it purchased, "the difference between the uncontrolled crude oil's market value and the discounted price *could* be extra consideration above the maximum price for the controlled crude oil." Interpretation 1980–43 at 6 (emphasis supplied). However, according to DOE, the existence of any regulatory violation could not be determined without knowledge of addition-

al facts. In the transaction described by Cities in its request for interpretation it would be necessary to know, for example, why Cities was able to purchase stripper well crude oil at below market prices. *Id.* Thus, this statement in the interpretation, as well as a host of others, was mere speculation by DOE about unknown facts that might affect the lawfulness of Cities' proposed transaction. In no manner did it purport to state as the position of DOE that the proposed transaction was or was not lawful. Nor, according to the representations of counsel, has any decision been made by DOE to conduct a preenforcement audit of these transactions.[13] DOE, in Interpretation 1980–43, has therefore not told Cities it must do anything, and has not told Cities that it has violated any regulations. At most DOE has told Cities that *if* it conducts an audit—which it may never do—it will examine the circumstances of Cities' transactions to determine whether Cities received consideration in excess of the lawful maximum price of the controlled crude oil it sold to its trading partner or violated any other aspect of the crude oil price and allocation regulations. This is insufficient to constitute final agency action.

*The Prospect of Immediate or Certain Future Injury to Cities and the Impact of the Controversy on Cities' Business*

■ There is also no case or controversy because Cities has failed to demonstrate that the official action challenged will cause it to sustain some immediate injury and that this injury could be redressed by the judicial relief sought. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978).[14] In this instance there is no cognizable injury that can be traced to DOE's promulgation of the regulations at issue or to its decision that it could not determine within the interpretive process whether Cities' transactions were consistent

---

12. Agency action is also not final unless "the process of administrative decision-making has reached a stage where judicial review will not disrupt the orderly process of adjudication...." 400 U.S. at 71, 91 S.Ct. at 209.

13. *See* Doc. No. 43 at 7.

14. This aspect of the constitutional ripeness doctrine is a variant of the " 'established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of

with these regulations. Cities is not in a position of being under a compulsion to comply with a law which it believes to be invalid, nor is there any threat of enforcement of regulations which pose a "chilling effect" upon the exercise of protected rights. *See, e. g., Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). Because of President Reagan's decontrol of the prices of crude oil and crude oil products, the regulations at issue are inapplicable to any current or prospective transactions. Therefore, the only arguable injury that Cities can point to is the possibility that DOE will eventually bring an enforcement action against it and the effect on its business planning of continuing uncertainty over whether its reading of the regulations might some day be declared erroneous, thus requiring payment of the entitlements obligations it believed it was not required to make. It is established, however, that "[t]he mere possibility of prosecution or the possibility that sanctions authorized under a general regulatory regime may be imposed when the regulatory agency is confronted with specific facts developed in some future agency proceeding is insufficient" to create a case or controversy under Article III. *Martin Tractor Co. v. Federal Election Commission,* 627 F.2d 375, 379 (D.C.Cir.1980).

An analysis of the closely related prudential requirement for preenforcement review that the controversy have a direct and immediate impact upon the plaintiff's business also compels the conclusion that the issues presented are nonjusticiable. Since DOE took no position in Interpretation 1980–43 regarding the lawfulness of Cities' transaction, it follows *a fortiori* that the interpretation has had no direct and immediate impact on Cities' business affairs. As stated above, DOE has not directed Cities to do anything to which it objects. Indeed, because of the deregulation of oil, Cities is not even in the position of having to decide how to structure present and future transactions in order to comply with the regulations. More significantly, Cities is not on the "horns of a dilemma" which would require

it to choose between incurring the costs of complying with regulations it believes to be invalid or disregarding the regulations and running the risk of later facing serious criminal and civil penalties. *See Abbott Laboratories v. Gardner, supra,* 387 U.S. at 152–53, 87 S.Ct. at 1517–18. Cities may never be faced with an enforcement action, and if an enforcement action should be brought, Cities may prevail at the administrative level.

■ Cities' assertion that its concern over a potential liability of $250,000,000 (which is growing each day because of interest charges that would be imposed if liability were established) has a present adverse impact upon the company's business planning and investment policy is an insufficient prospect of imminent injury to warrant the exercise of judicial power. While the Court assumes for present purposes that these concerns are both substantial and real, this harm to Cities cannot be traced to any final DOE action. A substantially similar problem was raised recently in *Texaco, Inc. v. Department of Energy,* 490 F.Supp. 874 (D.Del.1980), in which Texaco sought, *inter alia,* a declaratory judgment that its pricing policies were not violative of certain DOE regulations. Judge Stapleton, in ruling that the case was not ripe for adjudication, rejected Texaco's claim that its concern over its potential liability was traceable to agency action:

> What Texaco points to as a 'present' effect, the impact of its possible liability for $888,000,000 on its ability to plan is, in a sense, a current problem, but it stems from Texaco's concern about what the DOE may do or find at some point in the future and not from final action it has taken in the past. If steps taken, amounts expended, or other burdens shouldered by regulated companies because of anticipated future agency action justified judicial review, the objectives of the ripeness doctrine would again be frustrated.

Similarly, in this case, any present impact on Cities stems from its concerns about

---

that action. . . . '" *Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972),

*quoting ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937).

what DOE *might* do in some future enforcement proceeding. While it may be possible that DOE could have alleviated some of Cities' concerns through the interpretive process, the Court is unwilling to conclude that a good faith agency decision[15] that that process was inappropriate for determination of the lawfulness of a series of a complex transactions can be declared the direct and immediate cause of any hardship to Cities. DOE's interpretation was not the source of Cities' concern about its potential liability; rather, DOE simply decided that it was unable to eliminate those concerns in an interpretive ruling. In order for agency action to be ripe for review, the "plaintiff must demonstrate that it incurs an identifiable *hardship* which is *directly and immediately* traceable to the bare existence of a fixed agency position on the legal question which is the subject of the plaintiff's complaint." *Standard Oil Co. v. FEA*, 440 F.Supp. 328, 365–66 (N.D.Ohio 1977) (emphasis in original) (footnote omitted), *aff'd*, 596 F.2d 1029 (Temp.Em.Ct.App. 1978). Here, any hardship to Cities cannot be traced to final agency action, but rather stems from its own concerns about what DOE *might* do in the future and how the applicable regulations might eventually be interpreted. *See Texaco, Inc. v. DOE, supra*, 490 F.Supp. at 889. Cities therefore fails to satisfy the hardship prong of the prudential ripeness test.

To hold that this action is justiciable would mean that any person could bring a declaratory judgment action to determine the meaning of a statute or regulation whenever its effect is uncertain or there is a vague specter of enforcement. While certainty regarding business transactions may be a legitimate goal, there would be no ripeness requirement left if a plaintiff could sue whenever it was concerned about its potential liability for past transactions. Businessmen and others must live with their considered choices. Presumably, when Cities engaged in the transactions at issue it had either determined that they were clearly consistent with the regulations, or

that the meaning of the regulations was unclear but the transactions at least arguably satisfied them. If the regulations are clear in their meaning, Cities should have no concerns over possible enforcement actions. If the meaning of the regulations is unclear, Cities will have to bear that uncertainty as a self-imposed cost of entering the transactions.

### Conclusion

The Court having considered all other arguments presented by Cities and found them to be without merit, and having concluded that the claims presented are not ripe for judicial review, an order will be entered dismissing the complaint.

---

**15.** The Court has been shown no evidence that DOE acted other than in good faith when it determined that it could not resolve through the interpretive process the question of the lawfulness of Cities' transactions.