NATIONAL DISTILLERS AND CHEMI-
CAL CORPORATION and National
Hydrocarbons, Inc., Plaintiffs,

v.

DEPARTMENT OF ENERGY and
Charles W. Duncan, Secretary of
Energy, Defendants.

Civ. A. No. 79–399.

United States District Court,
D. Delaware.

Feb. 26, 1980.

Charles F. Richards, Jr. and Stephen E.
Herrmann of Richards, Layton & Finger,
Wilmington, Del., Edward J. Ross and Mi-
chael A. Small of Breed, Abbott & Morgan,
New York City, John P. Mathis of Baker &
Botts, Washington, D. C., of counsel, for
plaintiffs.

James W. Garvin, Jr., U. S. Atty., John X.
Denney, Jr., Asst. U. S. Atty., Wilmington,
Del., Dina R. Lassow, U. S. Dept. of Justice,
Don Crockett, U. S. Dept. of Energy, Wash-
ington, D. C., of counsel, for defendants.

MEMORANDUM OPINION

LATCHUM, Chief Judge.

This is an action seeking declaratory and
injunctive relief from an alleged "interpre-
tation" by the Department of Energy
("DOE") of Subpart K of its Mandatory
Petroleum Price Regulations.[1] The case is
presently before the Court on defendants'
motion to dismiss for proper venue.[2]

I. *Background*

National Distillers and Chemical Corpora-
tion ("Distillers") is a Virginia corporation
which has been engaged in the chemical
business for more than a quarter of a centu-
ry. In the early 1950s, Distillers began
operating a gas processing and petrochemi-

---

1. *See*, 10 C.F.R., Part 212.

2. While the defendants also moved to dismiss
for lack of subject matter jurisdiction and fail-

ure to state a claim upon which relief can be
granted, the Court reserves judgment on those
motions in view of its disposition of defend-
ants' venue motion.

cal plant at Tuscola, Illinois, for the primary purpose of producing polyethylene and other products from ethane. In order to obtain the ethane it requires for its operations, Distillers purchases wet natural gas[3] from another company and extracts the ethane from the wet natural gas. The extraction process which Distillers uses also removes the natural gas liquids from the wet natural gas. The natural gas liquids are then fractionated into the separate natural gas liquid products, i. e., propane, butane, and natural gasoline. Thus, these last three products are by-products of Distillers' ethane extraction process.

Distillers disposes of these by-products by two different methods. The propane and butane are sold to Phillips Petroleum Company ("Phillips") on the basis of an agreement that Phillips will pay Distillers a certain percentage of its resale price.[4] The natural gasoline on the other hand is sold to Phillips for a fixed price per unit of volume.

In 1975 the Federal Energy Administration ("FEA")[5] promulgated Subpart K and thereby established two different methods for determining the maximum price which could be charged for certain products including propane and butane. One method was to be used if the sale was a "net-back sale" and another method was to be used if the sale was a "first-sale." A "net-back sale" was defined as a "transfer for value to a class of purchaser for which a percentage of revenues from the first sale of natural gas liquids or natural gas liquid products is received." 10 C.F.R. § 212.162. A "first-sale" was defined as "the first transfer for value to a class of purchaser for which a fixed price per unit of volume is determined." Id.

Distillers and Phillips interpreted those definitions to mean that Distillers' sales of butane and propane to Phillips were net-back sales. They, therefore, determined the sale price that Distillers should receive in accordance with the net-back sale pricing method described in Subpart K.

In August 1978, DOE advised Distillers that it was going to audit Distillers' Tuscola operations and a pre-audit conference was scheduled for September 15, 1978. At that conference the auditors stated a "tentative" view that Distillers' sales of propane and butane should be treated as first-sales under Subpart K rather than as net-back sales. Distillers vigorously disputed this "tentative" view, and accordingly, on November 3, 1978, Distillers filed a request as suggested by the auditors for an interpretation from the General Counsel of DOE.[6]

The DOE auditors completed their audit towards the end of 1978 and on the basis of that audit the Economic Regulatory Administration of DOE issued a Notice of Probable Violation ("NOPV") to Distillers on May 30, 1979. The NOPV stated that there was "reason to believe that during the period September 1973 through August 1978 (Distillers) charged prices in excess of those permitted by the applicable regulations" and as a result received overpayments for butane and propane from Phillips in the amount of $72,290,505. (Docket Item 4, Ex. 7, p. 31). Approximately two weeks later the General Counsel notified Distillers that its request for an interpretation had been dismissed because the issues that were raised therein could be better dealt with in the pending enforcement proceeding.

On August 8, 1979, an inactive Delaware corporation with the name of U.S. Industrial Alcohol Co., filed an Amendment of its Certificate of Incorporation with the Delaware Secretary of State in which it changed its name to National Hydrocarbons, Inc. ("Hydrocarbons") and expanded the nature of the business of the corporation. (Docket Item 14A, Ex. 6). Less than one week later, Hydrocarbons, a wholly owned subsidiary of Distillers, became the owner of that

---

**3.** Wet natural gas contains natural gas, ethane, and natural gas liquids.

**4.** Distillers and Phillips have been operating on that basis by written agreements since 1953.

**5.** DOE has since assumed the FEA's responsibilities. *See*, 42 U.S.C. §§ 7101 *et seq.*, and Executive Order No. 12009.

**6.** *See*, 10 C.F.R., Part 205, Subpart F; Docket Item 4, Ex. 6, pp. 24–25 & 39.

portion of Distillers' Tuscola operations which is devoted to the extraction and fractionation of ethane, propane, butane and natural gasoline. Hydrocarbons then joined with Distillers in filing this action on August 14, 1979.

## II. Venue

 The complaint alleges that venue is proper under 28 U.S.C. § 1391(e)(4). (Docket Item 1, ¶ 7). That section provides:

A civil action in which a defendant is an officer or employee of the United States or any agency thereof . . . or an agency of the United States, may, . . be brought in any judicial district in which . . . the plaintiff resides if no real property is involved in the action.

Id. For purposes of section 1391(e)(4) a corporation resides only in the state where it is incorporated. *Amoco Production Co. v. DOE*, 469 F.Supp. 236, 243 (D.Del.1979). In order for venue to be proper under section 1391(e)(4), however, it is not necessary for all of the plaintiffs to reside in the district. It is sufficient if at least one of the plaintiffs resides in the district. *Exxon Corp. v. FTC*, 588 F.2d 895, 899 (C.A.3, 1978).

In this case the complaint alleges that Hydrocarbons is incorporated in Delaware. (Docket Item 1, ¶ 3). Venue thus appears to be proper on the face of the complaint even though the complaint also alleges that Distillers is incorporated in Virginia. (*See*, Docket Item 1, ¶ 3).

DOE argues, however, that Hydrocarbons' only interest in this case is derived from the recent transfer to it of a part of Distillers' Tuscola operations and that that transfer was made by Distillers solely for the purpose of obtaining venue in this district. DOE contends that venue should, therefore, be found to be improper because it was obtained by means of an improper

and collusive joinder of Hydrocarbons as a plaintiff.

Plaintiffs respond to DOE's contention by arguing that the suit should not be dismissed even if the joinder of Hydrocarbons as a plaintiff could be found to have been the result of collusion between it and Distillers[7] because venue which is obtained by such means is nevertheless proper.[8] The Court does not agree.

 The manufacturing of jurisdiction by means of collusive joinder of parties has been statutorily proscribed for many years. The current statutory provision, 28 U.S.C. § 1359, reads as follows:

A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

Plaintiffs correctly point out that there is no comparable statutory provision relating to venue. Nevertheless, the Court believes that similar principles should be applied with regard to the venue requirements in this case.

When Congress enacted section 1391(e) it clearly intended to give plaintiffs a broader choice of forums in which to bring an action against a government official or agency. *See, Stafford v. Biggs*, —— U.S. ——, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980); *Schlanger v. Seamans*, 401 U.S. 487, 490 n. 4, 91 S.Ct. 995, 997, 28 L.Ed.2d 251 (1971). It is also clear, however, that Congress did not intend to give plaintiffs the right to bring such suits in any district they might choose. *See, Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 2717, 61 L.Ed.2d 464 (1979). Instead, Congress gave plaintiffs the right to chose between one of several specifically listed potential districts. *See*, 28 U.S.C. § 1391(e). That statutory scheme would be effectively destroyed if the Court were to allow a plaintiff to manu-

7. The plaintiffs do not admit that the joinder did result from collusion but, on the other hand, the plaintiffs have not attempted to justify or give reasons for the transfer of the property to its wholly owned subsidiary.

8. As support for that proposition plaintiffs cite *Dixie Portland Flour Mills, Inc. v. Dixie Feed &*

*Seed Co.*, 272 F.Supp. 826 (W.D.Tenn.1965), *aff'd* 382 F.2d 830 (C.A.6, 1967). That case, however, is clearly distinguishable because it permitted the dropping of a corporate plaintiff which interfered with its co-plaintiff's otherwise proper venue, rather than the joinder of a co-plaintiff in order to create venue.

facture or create venue in any district it might choose by means of a collusive joinder of a party. The Court, therefore, concludes that venue is not properly founded if it has been obtained by means of a collusive addition of a party.

The Court's conclusion is also supported by the Third Circuit Court of Appeals' decision in *Exxon Corp. v. FTC*, 588 F.2d 895 (1978). In that case the court expressly stated that district courts should not permit plaintiffs to "circumvent venue requirements." *Id.* at 899. The Court recognizes that in the *Exxon* case the Third Circuit was focusing on the problem of the joinder of a plaintiff with a frivolous claim in order to manufacture venue. Nevertheless, the Court does not believe that the manufacturing of venue by means of a collusive joinder of a party is any less objectionable than the manufacturing of venue by means of the joinder of a party with a frivolous claim. Consequently, the only question that remains is whether the joinder of Hydrocarbons as a co-plaintiff was collusive.

In *Miller and Lux v. East Side Canal Co.*, 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189 (1908) the Supreme Court held that a predecessor statute to section 1359 precluded the district court from exercising jurisdiction because the plaintiff corporation had been collusively made a party to the action by means of a transfer of property to it by its parent corporation. The Court's holding was based on the fact that the plaintiff's status as a wholly owned subsidiary made the transfer of the ownership of property essentially a matter of form; and on the fact that the evidence demonstrated that the transfer was made for the sole purpose of obtaining jurisdiction. *See also, Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469 (C.A.2, 1976).

■ The same type of reasoning appears to be applicable to this case. Here, similar to *Miller and Lux*, the Court is confronted with a relationship between the two plaintiffs which makes the ownership of the transferred property largely a matter of form. The Court also has before it a number of facts which strongly suggest that the transfer was made for the sole purpose of obtaining venue in this district. However, before it makes a finding of collusion, this Court will afford the plaintiffs with an opportunity to present facts showing that the transfer was not made for the purpose of creating venue in this district.[9] *See, Local 336 Amer. Federation of Musicians AFL–CIO v. Bonatz*, 475 F.2d 433, 437 (C.A.3, 1973); *Groh v. Brooks*, 421 F.2d 589, 594–95 (C.A.3, 1970). Accordingly, the plaintiffs will be granted a reasonable time in which to file any documents, affidavits, or other evidence which they believe to be relevant to the venue issue or otherwise defendants' motion to dismiss for improper venue will be granted without further notice. *See, Tanzymore v. Bethlehem Steel Corp.*, 457 F.2d 1320, 1323–24 (C.A.3, 1972).

---

**9.** It is well established in this district that the plaintiff has the burden of proving proper venue once the issue has been raised in a timely manner by the defendant. *Funnelcap, Inc. v. Orion Industries, Inc.*, 392 F.Supp. 938, 942 (D.Del.1975); *United Industrial Corp. v. Nuclear Corp. of America*, 237 F.Supp. 971, 979 (D.Del.1964); *see also, Ryan v. Glenn*, 52 F.R.D. 185, 192 (N.D.Miss.1971) and cases cited therein.