TEXAS ENERGY RESERVE CORPORATION, Plaintiff,

v.

DEPARTMENT OF ENERGY and Charles W. Duncan, Jr., Secretary of Energy, Defendants.

RFB PETROLEUM, INC., and Hideca Petroleum Corp., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF ENERGY, Defendant.

Civ. A. Nos. 81–23, 80–622.

United States District Court, D. Delaware.

March 31, 1982.

stroyed referred to both defendants, a new trial is granted as to each defendant.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for

plaintiff in Civ. A. No. 80–622; Sim Lake, Laurance C. Mosher, Jr., and Jerry E. Smith, Fulbright & Jaworski, Houston, Tex., of counsel.

Joseph J. Farnan, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., C. Max Vassanelli, and Thomas H. Peebles, Dept. of Justice, Thomas H. Kemp, and Judith A. Mather, Dept. of Energy, Washington, D. C., for defendants.

Bruce M. Stargatt, and Jack B. Jacobs, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for plaintiffs in Civ. A. No. 81–23; Thomas E. Engel, and Robert P. Knapp, III, Hale, Russell & Gray, New York City, Charles H. Carmouche, Dickerson, Hamel, Early & Pennock, Houston, Tex., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

These are two actions seeking pre-enforcement review of several regulations promulgated by the Department of Energy ("DOE" or "the Government") governing the pricing of crude oil by resellers. Plaintiffs Texas Energy Reserve Corporation ("Texas Energy"), RFB Petroleum, Incorporated ("RFB Petroleum"), and Hideca Petroleum Corporation ("Hideca") are crude oil resellers. They seek a declaratory judgment in this Court that the challenged regulations are procedurally and/or substantively invalid, and further seek to enjoin DOE from enforcing these regulations against them. The Government has moved to dismiss both actions on ripeness and exhaustion grounds, and also has raised venue objections in both actions. Although the parties differ in their procedural posture before the agency, the Court consolidated

the cases for oral argument because the principal issues raised in each were the same.

## I.  Statutory and Regulatory Background

The regulations at issue originally were promulgated under the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 et seq., which became law on November 27, 1973. The Act required the President to promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and refined petroleum products. 15 U.S.C. § 753(a). The Act further contained nine specific objectives which the regulation was to implement to the maximum extent practicable. See 15 U.S.C. § 753(b)(1)(A)–(I).[1] To carry out this mandate, the President established the Federal Energy Office ("FEO"). See Exec. Order No. 11,748, 38 Fed.Reg. 33,575 (1973). Among other responsibilities, FEO received the Cost of Living Council's price stabilization authority under the Economic Stabilization Act with respect to petroleum products and crude oil. 39 Fed.Reg. 24 (1974); see 12 U.S.C. § 1904 note (Economic Stabilization Act of 1970). FEO issued Mandatory Petroleum Allocation and Price Regulations on January 15, 1974. 39 Fed. Reg. 1924 (1974).

On June 27, 1974, FEO's responsibility for regulation of petroleum pricing and allocation was transferred to the new Federal Energy Administration ("FEA"), which had been established by the Federal Energy Administration Act, 15 U.S.C. § 761 et seq., and executive order. Exec. Order 11,790, 39 Fed.Reg. 23,185 (1974). In 1977, this function passed to the Department of Energy under the Department of Energy Organization Act, 42 U.S.C. § 7101 et seq., and Executive Order No. 12,009, 42 Fed.Reg. 46,267 (1977).

---

1. These objectives included protection of public health, safety and welfare, and the national defense; maintenance of all public services; maintenance of agricultural operations; preservation of an economically sound and competitive petroleum industry; allocation of crude oil to refineries to permit operation at full capacity; equitable distribution of petroleum products at equitable prices among all regions of the country and sectors of the petroleum industry; allocation of petroleum products as necessary for maintenance, exploration, and production of fuels and minerals; economic efficiency; and minimization of economic distortion. 15 U.S.C. § 753(b)(1)(A)–(I).

From 1974 to 1978, crude oil resales were governed by 10 C.F.R., Part 212, Subpart F. These regulations established a maximum lawful price for resales of crude oil equal to the weighted average price that the crude oil reseller had charged for comparable crude oil on May 15, 1973, plus the amount by which the reseller's cost of purchasing crude oil had increased since that date. 10 C.F.R. 212.93 (1978).

On January 1, 1978, Subpart L to 10 C.F.R. Part 212 went into effect. Subpart L, governing only resales of crude oil, generally permitted a crude oil reseller to charge any price in an individual resale, as long as the reseller's "average mark up"[2] for all resales in the month did not exceed its "permissible average mark up" ("PAM").[3] 10 C.F.R. 212.183(a). These resales were further governed by the so-called "layering" rule, which provided that "[t]he price for crude oil charged by a reseller which in a sale performs no service or other function traditionally and historically associated with the resale of crude oil shall not exceed the actual price paid by the reseller for the crude oil. . . ." 10 C.F.R. 212.186.

On December 1, 1980, the two regulations challenged in these lawsuits were promulgated. First, DOE amended the pricing rule to provide for a PAM of 20 cents per barrel for all resellers who had sold crude oil before December 1, 1977. 10 C.F.R. 212.182 (1980). Second, DOE amended the pricing rule which had permitted resellers to charge any price in an individual sale, requiring:

. . . if between the time of purchase and the time of resale of crude oil by a reseller (1) the crude oil remained in the same physical location or (2) such reseller did not take actual physical possession of the crude oil, the reseller shall not charge a price for that crude oil which exceeds the acquisition cost of that crude oil. . . .[4]

10 C.F.R. 212.183(a). Finally, on January 30, 1981, by executive order President Reagan exempted all crude oil and refined petroleum products from the price and allocation controls adopted pursuant to the EPAA. Exec. Order No. 12,287, 46 Fed. Reg. 9909 (1981).

The plaintiffs, who are crude oil resellers, challenge the "layering" and "PAM" rules as procedurally and substantively invalid. They allege that the regulations are based on the erroneous assumption that crude oil traders do not perform a function or service traditionally and historically associated with crude oil resale. Plaintiffs further argue that DOE promulgated the regulations in excess of its statutory authority under the EPAA, that the regulations are arbitrary and capricious, that they are void for vagueness, and that they violate the just compensation, procedural due process, and equal protection guarantees of the Constitution. In addition to these substantive challenges, plaintiffs charge that the rules are procedurally invalid because of various alleged defects in their promulgation. Hideca and RFB Petroleum have each received

---

**2.** The regulations defined "average markup" as "the total revenues in all sales of crude oil by the reseller in a particular month less the total costs and expenses associated with sales of crude oil in the month, divided by the number of barrels sold by the reseller in the month." 10 C.F.R. 212.182 (1978).

**3.** The regulation defined "permissible average markup" in two different ways. Generally, for those engaged in crude oil resale before or during May 1973, the PAM is the total lawful revenues in all sales of crude oil by the reseller in May 1973, less all allowed costs and expenses, divided by the number of barrels sold during that month. For those resellers who had not sold crude oil before May 1973, the PAM is the total lawful revenues in all sales of crude oil during November 1977, less the costs

and expenses, plus the unrecovered per barrel increase in administrative expense and transportation and gathering cost incurred since the reseller's first month of crude oil sales. 10 C.F.R. 212.182 (1978).

**4.** The regulation provides four exceptions to this rule: "(i) the reseller was the importer of record or (ii) the reseller purchased the crude oil from the producer of that crude oil or (iii) the reseller sells the crude oil to a refiner which certifies in writing to the reseller that the crude oil is being purchased for refining purposes, or (iv) the reseller receives certification from the refiner which refines the crude oil that such refiner would not have received the crude oil but for the reseller's service." 10 C.F.R. 212.-183(a).

a Notice of Probable Violation ("NOPV") from DOE regarding the regulations; DOE audited Texas Energy in January of 1981, but as of yet Texas Energy has not received an NOPV. Nevertheless, the crude oil resellers do not challenge the pending enforcement actions within the agency, but rather the regulations themselves.

The Government has moved to dismiss these suits on several grounds. First, it has raised separate venue objections with respect to each of the actions consolidated here. Second, it contends that the issues presented here are not ripe for judicial consideration at this time. Third, DOE argues that the parties have failed to exhaust administrative remedies and therefore may not now seek judicial review. The Court will address the venue and ripeness issues, but need not address exhaustion in light of its disposition of the ripeness issue.

## II. *Venue*

DOE has raised venue objections in each of the cases consolidated here for review.[5] It alleges that Texas Energy's incorporation in Delaware shortly before filing suit in this District raises a *prima facie* case of collusive venue which has not been rebutted. DOE also argues that RFB Petroleum's addition of Hideca as a party by amending its complaint was an improper attempt to obtain venue, and that its suit should therefore be dismissed.

The collusive venue claim may be addressed quickly. According to the Government, on May 27, 1980, Texas Energy Reserve Corporation was incorporated in Delaware. On December 18, 1980, Texas Energy Reserve Corporation of Texas merged with the Texas Energy Reserve Corporation of Delaware. Two weeks later, Texas Energy filed this lawsuit in the District of Delaware. Relying principally on this Court's decision in *National Distillers and Chemical Corp. v. DOE*, 487 F.Supp. 34 (D.Del.1980), the Government contends that

the merger was accomplished for the sole purpose of obtaining venue in Delaware, and that therefore the action should be dismissed.

The Court cannot agree with the Government that the facts presented rise to the level of collusive venue. Texas Energy has asserted that the December merger of the Delaware and Texas corporations was simply the consummation of a corporate reorganization designed to reduce the franchise taxes paid by the firm. According to the affidavit of John R. Allender, an attorney involved in this transaction, in December of 1979 Texas Energy Reserve Corporation of Texas began to establish a corporate holding company structure by incorporating various subsidiaries in Delaware. Affidavit of John R. Allender, C.A. No. 80–622, Docket No. 17. In April or May of 1980, preparation began for a tax-free reincorporation of Texas Energy in Delaware. Although most of the documents relating to the merger were executed in September of 1980, the company delayed the merger until December 18, 1980 due to its concern about possible double payment of Texas franchise taxes. *Id.*

This case is therefore distinguishable from *National Distillers and Chemical Corp. v. DOE*. In that case, a Virginia corporation had transferred the portion of its business affected by the DOE regulations it wished to challenge to a previously inactive Delaware corporation which was a wholly owned subsidiary. That corporation then joined the Virginia corporation in the lawsuit. 487 F.Supp. at 35–36. Those facts strongly suggested to the Court that the transfer of business, which was largely a matter of form, was accomplished solely to obtain venue in Delaware. *Id.* at 37. The Court further noted that "[t]he plaintiffs do not admit that the joinder did result from collusion but, on the other hand, the plaintiffs have not attempted to justify or give reasons for the transfer of the property to

---

**5.** Venue in this action is governed by 28 U.S.C. § 1391(e)(4). That section provides: "A civil action in which each defendant is an officer or employee of the United States or any agency thereof ... or an agency of the United States, may ... be brought in any judicial district in which ... (4) the plaintiff resides if no real property is involved in the action."

its wholly owned subsidiary." *Id.* at 36 n.7. It therefore granted plaintiffs an opportunity "to present facts showing that the transfer was not made for the purpose of creating venue in this district." *Id.* at 37. Here, in contrast, Texas Energy has advanced a legitimate business reason for the merger which is unrelated to the creation of venue in this District, and has submitted an affidavit to that effect. Even if one accepted DOE's contention that the facts establish a *prima facie* case of collusive venue, the affidavit effectively rebuts that allegation. The Court holds, therefore, that Texas Energy's suit is properly venued in the District of Delaware.

The second venue issue is somewhat more troubling. The Government challenges RFB Petroleum's addition of Hideca as a party as improper because it was done without leave of the Court. The basic facts are not in dispute. On January 28, 1981, RFB Petroleum, a Texas corporation, filed its complaint in this action. The Government filed a motion to dismiss, alleging in part that venue did not lie in Delaware because RFB Petroleum did not reside in Delaware as required by the statute.[6] On May 4, 1981, the day before it filed its reply to the motion, RFB Petroleum amended its complaint to add Hideca, a Delaware corporation, as a plaintiff. Hideca had received an NOPV from DOE on March 16, 1981. The Government asserts that under the Federal Rules, a party may not be added without leave of the Court as required under Rule 21.[7] It argues that Hideca must be dropped from the suit, and therefore venue is improper in Delaware. RFB Petroleum counters that it properly added Hideca as part of its amendment of right under Rule 15(a).[8]

The issue before this Court is which rule governs the addition of parties. There is little agreement on this issue among the courts and commentators who have addressed the question. As one commentator has noted:

> Most courts have held that the specific provision relating to joinder in Rule 21 governs over the more general text of Rule 15, and that an amendment changing parties requires leave of court even though made at a time when Rule 15 indicates it could be done as of course.... However, it has been held that if plaintiff files an amended complaint without first obtaining leave to add an additional party, the defect may be corrected and does not require dismissal of the action.

7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1688 (1972); *see* J. Moore, *Moore's Federal Practice* ¶ 15.07[3] (2d ed. 1980) (most courts follow Rule 21 rather than Rule 15, but noting that Fifth Circuit has followed opposite route); Annot., *Necessity of Leave of Court to Add or Drop Parties by Amended Pleading Filed Before Responsive Pleading is Served, Under Rules 15(a) and 21 of Federal Rules of Civil Procedure*, 31 A.L.R.Fed. 752 (1977). Nevertheless, the same commentator has advocated the view that Rule 15(a) is the preferable rule governing this situation, arguing that Rule 15 is actually the more specific provision because it sets forth a particular means of adding parties, and that applying Rule 15 in this context serves the purpose of the rules by ensuring that the court avoids the necessity of passing on pleadings at an early stage of litigation. *See* 6 Wright & Miller, *Federal Practice and Procedure* § 7149; *McLellan v. Mississippi Power &*

---

**6.** For purposes of this statute, residence of a corporation is defined as the state of incorporation. *See Amoco Production Co. v. DOE*, 469 F.Supp. 236, 243 (D.Del.1979).

**7.** Rule 21 provides: "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21.

**8.** Rule 15(a) provides: "A party may amend his pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).

*Light Co.,* 526 F.2d 870, 873 (5th Cir. 1976) (following Wright & Miller's rationale), *vacated in part,* 545 F.2d 919 (5th Cir. 1977).

This Court has previously addressed this matter in dictum. In *United States v. Sinclair,* 347 F.Supp. 1129 (D.Del.1972), *appeal dismissed sub nom. United States v. Estate of Pearce,* 498 F.2d 847 (3d Cir. 1974), the complaint originally filed by the Government challenging the validity of a sequestration order failed to name the executrix of the estate as required under law. The Government had amended its complaint to name the executrix as a party defendant, arguing that Rule 15(a) permitted such action. Chief Judge Latchum noted:

> The Court is inclined to agree with the Government's argument, but even conceding the defendants' position to be correct, the Court has discretion under Rule 21 to add parties *at any time in the proceedings on such terms as are just.* Since the Court finds that no prejudice has resulted from the amendment, it will be permitted.

*Id.* at 1136 (emphasis in original); *accord Gibbs v. Titelman,* 369 F.Supp. 38, 53 (E.D. Pa.1973) (leave of court granted, so no conflict between Rules 15 and 21), *rev'd on other grounds,* 502 F.2d 1107 (3d Cir.), *cert. denied,* 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974); *see United States v. Montchanin Mills, Inc.,* 512 F.Supp. 1192 (D.Del.1981) (although Rules 15(a) and 21 have been held applicable to adding parties, mere misnomer of party properly corrected under Rule 15(a)).

■ The Court recognizes that parties should not be permitted to circumvent venue requirements by manipulating the Federal Rules. *See National Distillers and Chemical Corp. v. DOE,* 487 F.Supp. at 37. Nonetheless, given the split of authority, the Court is unprepared to hold in this context that the addition of a party by amending the complaint before a responsive pleading has been filed violates the rules. As a practical matter, dropping Hideca from this action and dismissing RFB Petroleum would waste judicial resources, because Hideca could simply file another ac-

tion and join RFB Petroleum as plaintiff. As another court has noted: "It would serve no useful purpose to require the plaintiffs to seek leave of the court to do that which they could have done without such leave in their original complaint." *Ahmad v. Independent Order of Foresters,* 81 F.R.D. 722, 728 (E.D.Pa.1979).

The Court therefore holds that Hideca was properly added as a party and that venue is proper in this District.

### III. *Ripeness*

■ DOE asserts that these cases are not yet ripe for judicial review. The ripeness doctrine "prevent[s] courts from becoming involved in administrative disputes which call for detailed factual analysis or technical expertise and which do not yet cause or threaten any concrete hardship." *Texaco, Inc. v. DOE,* 490 F.Supp. 874, 887 (D.Del.1980). The doctrine has both constitutional and prudential dimensions. The constitutional element of the doctrine is derived from the "case or controversy" requirement of Article III. As this Court recently noted in *Cities Service Co. v. DOE,* 520 F.Supp. 1132 (D.Del.1981): "A plaintiff challenging a governmental enactment or policy satisfies the ripeness aspect of the case or controversy requirement by demonstrating that operation of the enactment or policy will cause him to sustain some immediate injury and that the judicial relief requested would redress this injury." *Id.* at 1139. The determination of this element depends upon "whether the requisite injury is in sharp enough focus and the adverseness of the parties concrete enough to permit a court to decide a real controversy and not a set of hypothetical possibilities." *Martin Tractor Co. v. Federal Election Commission,* 627 F.2d 375, 379 (D.C.Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980).

■ Beyond this constitutional constraint, broader prudential considerations also enter into the determination of whether or not a case is ripe for judicial review, because of the court's discretion in awarding injunctive and declaratory relief. The

Supreme Court first developed the doctrine of pre-enforcement judicial review in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and its companion cases, *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), and *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).[9] In *Abbott Laboratories* the Court set forth the underpinnings of the ripeness doctrine as follows:

> Without undertaking to survey the intricacies of the ripeness doctrine, it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

387 U.S. at 148–49, 87 S.Ct. at 1515. It is not always clear where constitutional concerns end and prudential concerns begin. *Cities Service v. DOE*, 520 F.Supp. at 140; *see Coastal States Gas Corp. v. DOE*, 495 F.Supp. 1300, 1304 n.3 (D.Del.1980). Nevertheless, in this case the Court is satisfied that plaintiffs meet the constitutional requirements of concreteness and adversity. The Court must therefore consider whether prudential considerations render the case ripe for judicial consideration.

At the outset, plaintiffs have argued that the *Abbott Laboratories* trilogy is no longer the benchmark for determining ripeness in the context of pre-enforcement review of agency regulations. They assert that *Abbott Laboratories* was grounded in the notion that standards of judicial review were measured by the jurisdictional grant of section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–04. They then point out that in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Supreme Court held that "the better view is that the APA is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions," *id.* at 105, 97 S.Ct. at 984, and that courts must instead look to the substantive grants of jurisdiction from Congress. Plaintiffs therefore contend that this Court should not mechanically apply the *Abbott Laboratories* criteria to determine ripeness, but rather should look to the broad grant of Section 210(a) of the Economic Stabilization Act. *See* 12 U.S.C. § 1904 note (Economic Stabilization Act). That section provides:

> Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction ... and/or damages.

Section 211(a) grants the district courts exclusive original jurisdiction of "cases and controversies" arising under the Act. According to plaintiffs, this Court must simply determine whether they have suffered "legal wrong" under the Act without regard to traditional ripeness criteria.

Plaintiffs' argument is based upon a fundamental misconception of the ripeness doctrine and the cases which have developed it in the context of pre-enforcement review. In addition, they could not cite one case in this context that supports reading *Abbott Laboratories* out of the ripeness inquiry. In *Abbott Laboratories*, the Supreme Court addressed two issues. The first question it considered was "whether Congress by the Federal Food, Drug, and Cosmetic Act intended to forbid pre-enforcement review of this sort of regulation promulgated by the Commissioner." 387 U.S. at 139–40, 87 S.Ct. at 1510. The Court looked to section 10 of the Administrative Procedure Act and the legislative scheme, determined that there was no congressional intent to preclude judicial review, and concluded that it had jurisdiction to hear the challenge to the

---

**9.** Even though administrative compliance proceedings have begun, the mode of analysis is similar to that of pre-enforcement review. *See* *Exxon Corp. v. FTC*, 588 F.2d 895, 901 (3d Cir. 1978); *Texaco, Inc. v. DOE*, 490 F.Supp. at 887 n.18.

regulations. *Id.* at 141–48, 87 S.Ct. at 1511–15. The Court also addressed the question whether even if judicial review were not precluded, the Court should exercise its discretion to withhold consideration until the issue was ripe. The Court noted: "The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Id.* at 148, 87 S.Ct. at 1515. The ripeness criteria traditionally applied by the courts are derived from the second *Abbott Laboratories* inquiry, not the first. *Califano v. Sanders* in no way undercuts the traditional ripeness analysis because its holding addressed the first question treated in *Abbott Laboratories*—reviewability in the jurisdictional sense. Thus the language of the Economic Stabilization Act relied upon by plaintiffs "has not dispensed with the requirements of final agency action ... as considerations of ripeness and exhaustion of administrative remedies still must be accommodated." *Coastal States Gas Corp. v. DOE*, 495 F.Supp. at 1305 n.4.

■ The Court must therefore apply the standards established by the Supreme Court in *Abbott Laboratories* to determine whether the case is ripe. In *Abbott Laboratories*, the Supreme Court described this inquiry as "best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515. The Delaware District has developed four criteria for determining whether a case meets the *Abbott Laboratories* test:

> ... a controversy is ripe for pre-enforcement judicial relief if an affirmative answer can be given to the following four questions: (1) are the issues presented purely legal, (2) are the issues based on final agency action, (3) does the controversy have a direct and immediate impact on the plaintiffs' businesses, and (4) is the litigation calculated to expedite final resolution rather than delay or impede effective agency enforcement?

*Phillips Petroleum Co. v. FEA*, 435 F.Supp. 1239, 1245 (D.Del.1977), *aff'd*, 596 F.2d 1029 (Temp.Emer.Ct.App.1978). Each of these elements must be present for a case to be ripe for pre-enforcement review. The Court will address each requirement in turn.

■ The parties disagree as to the nature of the agency action challenged here. Plaintiffs assert that the agency action they seek to overturn is the promulgation of the regulations at issue. DOE argues that the action challenged is the commencement of agency enforcement proceedings against plaintiffs. It is clear from the pleadings and the arguments presented that plaintiffs are challenging "not the compliance proceeding but the regulatory pronouncements on which that proceeding is based. A determination of the ripeness of the controversy, therefore, must be made in that light." *Texaco, Inc. v. DOE*, 490 F.Supp. at 887. The fact that two of the parties have received NOPV's and one has not is thus relevant to the inquiry, but not determinative.

### A. *Purely Legal Issues*

The first element to be determined is whether the issues presented in this challenge are purely legal. DOE asserts that the validity of the regulations cannot be determined without first applying them to specific factual settings. It further argues that plaintiffs' allegations that the regulations are void for vagueness, constitute a taking, have no rational basis, and were promulgated as a result of *ex parte* communications require significant factfinding. Plaintiffs counter that their challenge is to the procedural and substantive validity of the regulations, and that these issues can be decided without substantial factfinding.

The Court agrees with plaintiffs that the issues presented for decision here are purely legal questions. In simplest terms, the sole issue for the Court to decide is whether the regulations are valid. The legality of the challenged regulations is not an issue which requires factfinding before an agency. The

factfinding in agency proceedings would focus on plaintiffs' conduct to determine whether they had violated the regulations, not on the conduct of the agency in formulating the regulations themselves. *See United Refining Co. v. DOE*, 482 F.Supp. 1131, 1135 (W.D.Pa.1980). In this action, the crude oil resellers do not challenge the specific application of the regulations to their peculiar factual situations, but simply whether the regulations were promulgated in accordance with law. *See Pennzoil Co. v. DOE*, 466 F.Supp. 238, 242 (D.Del.1979); *Northern Natural Gas Co. v. DOE*, 464 F.Supp. 1145, 1154 (D.Del.1979).

In *National Distillers and Chemical Corp. v. DOE*, 498 F.Supp. 707 (D.Del.1980), *aff'd*, 662 F.2d 754 (Temp.Emer.Ct.App.1981), Chief Judge Latchum addressed this precise issue. The plaintiff there challenged certain DOE pricing policies under which it had received an NOPV. The court explained that the issue of the validity of the policies was purely legal: "The issues framed by the complaint are wholly legal in nature, concerning the application of DOE regulations to uncontroverted facts." *Id.* at 715. The court further noted: "To resolve these questions, the Court need only examine the language of the pertinent regulations, the history surrounding promulgation of these regulations, and any evidence of the agency's contemporaneous interpretation of the regulations." *Id.* at 716; *see Phillips Petroleum Co. v. FEA*, 435 F.Supp. at 1245. The same is true here. RFB Petroleum and Hideca have conceded that in at least half of the transactions for which they have received NOPV's, their sole defense is the invalidity of the regulations. *See* Affidavit of Luis Wolff, C.A. No. 81–23, Docket No. 31; Affidavit of Richard

Donald Messig, C.A. No. 81–23, Docket No. 34. To the extent that there are factual disputes over the remaining transactions, these disputes would not affect the ability of this Court to rule on the bulk of plaintiffs' substantive and procedural challenges.[10] The relevant factual disputes concern the action the agency took in developing and promulgating the regulations. Such factual questions do not render the case unripe, for they would not be addressed by the agency in the course of compliance proceedings.

### B. *Final Agency Action*

The second element of the ripeness inquiry is whether there is final agency action. The government argues that there is no final agency action here because DOE has not determined that any of these companies have violated the regulations at issue. It points out that even after the issuance of an NOPV, a number of steps remain before an order is binding on the party.[11] DOE contends that this suit will not be ripe until the agency issues a final order finding a plaintiff in violation of the challenged rules. The plaintiffs assert, however, that the agency action they seek to reverse is not the enforcement proceeding, but rather the regulations themselves, and that these regulations are clearly final.

As previously noted, the crude oil resellers here challenge only the regulations. The parties have not asked this Court to review whether DOE properly issued the NOPV's, and in fact, it is unlikely that such a challenge to an NOPV would be entertained by this Court. By its terms, an NOPV is a notice of *probable violation*, not a conclusive determination of liability; "the NOPV itself is not binding on plaintiffs and

---

**10.** Those challenges that would require factfinding, such as plaintiffs' void-for-vagueness claim, could be severed and dismissed as unripe. *See Phillips Petroleum Co. v. FEA*, 435 F.Supp. at 1246 n.8. In view of the Court's disposition of the ripeness issue it is unnecessary to decide which of these claims would fall within this category.

**11.** After an NOPV, the agency may issue a Proposed Remedial Order (PRO). The party

may then file a Notice of Objection and receive a hearing before the Office of Hearings and Appeals (OHA). After such a hearing the agency may issue a Remedial Order (RO) which may be challenged before the Federal Energy Regulatory Commission (FERC). Only after such a hearing is concluded is an order "final" within the agency. *See generally* 42 U.S.C. § 7193(c).

does not have the force and effect of law." *National Distillers and Chemical Corp. v. DOE*, 498 F.Supp. at 716. An action challenging an NOPV would not be ripe; "the plaintiff faces no immediate harm of any kind since administrative steps remain to be taken before the Government's coercive powers are brought to bear." *Diversified Chemicals and Propellants v. DOE*, 432 F.Supp. 859, 864 (N.D.Ill.1977); *cf. FTC v. Standard Oil Co. of California*, 449 U.S. 232, 238–43, 101 S.Ct. 488, 492–95, 66 L.Ed.2d 416 (1980) (FTC "reason to believe" complaint not final agency action).

The Supreme Court has explained that final agency action is to be interpreted in a pragmatic way. *Abbott Laboratories v. Gardner*, 387 U.S. at 149–50, 87 S.Ct. at 1515–16. Under traditional ripeness principles, regulations promulgated by an agency may constitute final agency action. *See, e.g., Louisiana v. DOE*, 507 F.Supp. 1365, 1372 (W.D.La.1981); *United Refining Co. v. DOE*, 482 F.Supp. at 1135; *Pennzoil v. DOE*, 466 F.Supp. at 242; *Northern Natural Gas v. DOE*, 464 F.Supp. at 1154–55; *Phillips Petroleum Co. v. FEA*, 435 F.Supp. at 1246. The regulations at issue here were final and binding in effect, and had the force of law. They therefore constitute "final agency action" for purposes of this element of the ripeness inquiry.

## C. *Direct and Immediate Impact on Plaintiff's Business*

The third element of the ripeness inquiry, the requirement that the agency action have a direct and immediate impact on plaintiff's business, is the most difficult hurdle for plaintiffs to overcome. DOE contends that the decontrol of crude oil allocation and pricing has removed any direct and immediate impact that the regulations might have had on plaintiffs, and that they therefore cannot meet the "horns of a dilemma" test traditionally required for pre-enforcement review of agency regulations. Plaintiffs argue, however, that the hardship imposed upon them by the regulations rises to the requisite level of impact despite the absence of the traditional dilemma.

As noted previously, the President ordered the decontrol of crude oil allocation and pricing in January 1981, exempting all crude oil and refined petroleum products from the controls adopted pursuant to the EPAA. *See* Exec. Order No. 12287, 46 Fed. Reg. 9909 (1981). DOE subsequently rendered the challenged regulations ineffective. *See* 46 Fed.Reg. 20,508; 46 Fed.Reg. 20,516. The parties do not contest the fact that the crude oil traders no longer need comply with the regulations challenged in this lawsuit. What they do contest is the significance of decontrol to the ripeness inquiry.

Ordinarily, to have the requisite direct and immediate impact, plaintiff must suffer "an identifiable hardship which is directly and immediately traceable to the bare existence of a fixed agency position." *Texaco, Inc. v. DOE*, 490 F.Supp. at 888 (quoting *Standard Oil Co. v. FEA*, 440 F.Supp. 328, 365–66 (N.D.Ohio 1977), *aff'd*, 596 F.2d 1029 (Temp.Emer.Ct.App.1978)). The reason for this requirement is to preclude parties from challenging agency rules before such rules have an effect upon their businesses. As the Supreme Court explained in *Abbott Laboratories*:

> Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance....

387 U.S. at 153, 87 S.Ct. at 1517. Without this requirement, anyone could challenge agency action in the courts before enforcement proceedings had begun, seriously hampering the administrative process.

In general, courts have been reluctant to find a direct and immediate impact on a plaintiff without the so-called "horns-of-a-dilemma" situation. This test is derived from the factual situation in *Abbott Laboratories*. In that case, drug manufacturers sought to challenge regulations establishing

new labeling requirements for prescription drugs. These manufacturers had two choices: they could refuse to comply with the regulations, await a determination of violation by the agency and then challenge the regulation in the courts, thereby subjecting themselves to financial liability and possible prosecution; or they could comply with the expensive labeling provision and lose vast sums of money if the regulations were held invalid. *Id.* at 152–53, 87 S.Ct. at 1517. The Supreme Court explained that this agency action had "a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." 387 U.S. at 152, 87 S.Ct. at 1517.

Similarly, when courts have considered this question in the context of energy regulation, they have examined whether the regulation affects the companies in their daily operation—that is, in pricing their products on a *current* basis. *See Pennzoil Co. v. DOE*, 466 F.Supp. at 242–43; *Northern Natural Gas v. DOE*, 464 F.Supp. at 1155. In this case, however, the plaintiffs need not comply with anything; since decontrol, the challenged regulations have been inapplicable to any current or prospective transactions. *See Cities Service Co. v. DOE*, 520 F.Supp. at 1142. The plaintiffs admit that they are not on the horns of a pricing dilemma in the traditional sense of that test, but argue that they nevertheless have suffered sufficient impact from the regulations to render this case ripe for adjudication. In particular, they assert that the huge liability they may incur if they are found to have violated the regulations has so hampered their business operation, planning, and financing that they must have immediate judicial relief.

Plaintiffs particularly rely on *Standard Oil Co. v. FEA*, 440 F.Supp. 328 (N.D.Ohio 1977), *aff'd*, 596 F.2d 1029 (Temp.Emer.Ct. App.1978), where the district court found a case to be ripe even though it did not satisfy the horns-of-a-dilemma test. In *Standard Oil*, oil refiners challenged the FEA's interpretation of certain pricing regulations which had been effective during 1975 and

1976, but were no longer in effect at the time the suit was brought. Rather than follow the usual ripeness criteria, the district court instead enumerated four additional factors which, when taken together, constituted the requisite direct and immediate impact. The court first noted that the fact that the plaintiffs were subject to enforcement action resulted in harm "by casting doubt upon the propriety of past refiner conduct, on which the refiners must rely in planning the present and future operations of their businesses." *Id.* at 366. Second, the court explained that the plaintiffs and other members of the industry had a "huge potential liability hanging over their heads," which "must have a seriously adverse impact upon the budgeting and planning process. . . ." *Id.* Third, the court called attention to the serious threat of private enforcement actions under the Economic Stabilization Act. *Id.* at 367–68. Fourth, it noted the burdensome and costly effort entailed in the agency enforcement proceedings. *Id.* at 368–69. Taking the four elements together, the court concluded that under these unique circumstances, the parties had shown sufficient hardship to render the controversy ripe. *Id.* at 370. Plaintiffs here assert that this Court should follow the approach of the district court in *Standard Oil*, and find this case to be ripe even without a pricing dilemma.

The Court is reluctant to follow the *Standard Oil* approach. Not only does it unnecessarily broaden the standards for determining ripeness, but it also conflicts with the analysis Chief Judge Latchum employed in its companion case, *Phillips Petroleum Co. v. FEA*, 435 F.Supp. 1239 (D.Del.1977), *aff'd*, 596 F.2d 1029 (Temp.Emer.Ct.App. 1978). In that case, the district court faced the identical set of facts addressed by the *Standard Oil* court. Nevertheless, Chief Judge Latchum found that plaintiffs were in fact on the horns of a pricing dilemma because current prices were determined in part by reference to amounts established by the refiner's interpretation of the challenged regulations. *Id.* at 1246–47; *see Standard Oil Co. v. FEA*, 440 F.Supp. at 366–67. The direct and immediate impact, therefore, was on the pricing of the refin-

ers' petroleum products on a current basis. 435 F.Supp. at 1246. Although the Temporary Emergency Court of Appeals did not address the horns-of-a-dilemma holding, it affirmed both district courts' conclusions that the case was ripe. *See* 596 F.2d at 1039–40. In light of this District's steady adherence to the *Phillips Petroleum* ripeness criteria, this Court will not now shift to adopt other factors which might expand the ripeness analysis to the point where it jeopardizes administrative independence.[12]

The purpose of having a stringent test to determine direct and immediate impact is to prevent courts from interfering with agency operation until absolutely necessary. When a regulation places a business in a pricing dilemma and jeopardizes its ability to function effectively, immediate review may be warranted. But when a regulation is no longer legally binding, the court should not intervene prematurely because its intervention would only adjudicate the validity of conduct which has already occurred, and have no direct impact in determining the course of business to be taken by the party in the future. If a dilemma were not required, any regulation could be challenged in court by any party within its scope, and the ripeness inquiry would become meaningless.

This does not mean that a determination by this Court upholding certain past transactions of the plaintiffs because of the invalidity of the governing regulations would not affect the companies' operations. Clearly a company with a large potential liability must behave differently in the marketplace from one whose liability has been resolved. Any time a court conclusively determines liability it enables the affected parties to conduct their affairs with more certainty. But as this Court has previously noted: "While certainty regarding business transactions may be a legitimate goal, there would be no ripeness requirement left if a plaintiff could sue whenever it was concerned about its potential liability for past transactions. Businessmen and others must live with their considered choices." *Cities Service Corp. v. DOE*, 520 F.Supp. at 1143.

The mere fact that adjudication resolves uncertainty does not mean that a potential liability from a previously effective regulation constitutes a direct and immediate impact stemming from the existence of that regulation. In an ordinary pricing dilemma, once the court declares the regulation void, the company is relieved of its hardship—the burden of conforming its conduct to the regulation. This immediacy is missing when there is no dilemma, because even if the court finds the regulations invalid, this step alone does not remedy the hardship directly. The hardship in this instance is not compliance with a regulation, but inability to plan around a large contingent liability. It is eliminated only because the removal of the potential liability enables the business to operate without fear of financial losses. This impact on business is not sufficiently direct and immediate to justify involving the Court in the adjudication of whether or not two now-defunct regulations were validly promulgated.

· The question remains, however, whether the magnitude of harm is so great in this case that the Court should look beyond traditional ripeness criteria to grant immediate review. Both RFB Petroleum and Hideca have asserted at oral argument and in affidavits filed with the Court under seal that the enormous potential liability of the

---

12. The elements addressed by the court in *Standard Oil* may enter into the determination of whether there was direct and immediate impact. For instance, in *Texaco, Inc. v. DOE*, Judge Stapleton noted:

> The cost of defending an administrative enforcement proceeding and the injury to reputation resulting from the institution of such a proceeding can be factors to be considered in determining whether a party complaining of agency action has shown that the action has a direct and immediate impact upon it. *In*

> *and of themselves, however, they do not constitute the burden required by the ripeness doctrine to warrant immediate judicial review.*

490 F.Supp. at 889 (citations omitted) (emphasis added). In this case, however, plaintiffs admit that the hardship stems solely from this potential liability. The court in *Texaco* further explained that if mere costs and injury to reputation were sufficient, "judicial pre-emption of the administrative process would be the rule rather than the exception." *Id.*

NOPV's has virtually destroyed their financial capabilities by hampering their ability to borrow money, and in RFB Petroleum's case, by eliminating it from crude oil trading entirely. In *Exxon v. FTC*, 588 F.2d 895 (3d Cir. 1978), the Court of Appeals for the Third Circuit addressed a similar issue in the context of extra-enforcement review of agency treatment of documents obtained by administrative subpoena. In holding that the district court lacked discretion to decline to hear the merits of plaintiffs' challenge to the protective order governing the documents, the court held that the criteria of *Abbott Laboratories* applied to cases of extra-enforcement review, when the issue was "whether declaratory relief should be made available outside the channels normally provided for the challenge of agency action." *Id.* at 901. The court went on to hold that where the request for documents numbered in the tens of millions, even though the alleged injury of possible public dissemination of confidential documents was not immediate, the case was "so extraordinary in terms of the breadth of the underlying investigation and the volume of documents to be sought that the magnitude of the possible injury outweighs the lack of immediacy for the purpose of our *Abbott* analysis." *Id.* at 902.

It could be argued that under *Exxon*, the magnitude of the potential liability to the crude oil traders outweighs the lack of a pricing dilemma. However, in a case subsequent to *Exxon*, the appellate court sounded a retreat from its innovative extra-enforcement doctrine, holding a dilemma was required to satisfy *Abbott*. In *Wearly v. FTC*, 616 F.2d 662 (3d Cir. 1980), the court held a challenge to a subpoena unripe because "[b]esides failing to satisfy the *Abbott* requirement of finality plaintiffs did not establish whether the decision to comply with the subpoena placed them on the horns of a dilemma." *Id.* at 667. Where there was no compulsion to turn over the documents or face penalties, there was no dilemma. *Id.*

Although these cases arose in the context of extra-enforcement review, they indicate that the horns-of-a-dilemma requirement remains a vital part of the *Abbott Labora-*

*tories* inquiry in this circuit. Even if magnitude of harm is to be taken into account in the ripeness inquiry, the harm alleged here does not rise to such a level as to outweigh all other elements. The affidavits submitted by plaintiffs are conclusory at best, and fail to show a direct causal relationship between the challenged regulations and the plaintiffs' alleged business difficulties. For instance, the treasurer of RFB Petroleum avers that the company must carry the nearly $3.4 million alleged overcharge as a contingent liability. He further avers that the company lost its credit line with New York bankers in May of 1981 "due in large part to the financial posture of the company vis-a-vis its contingent liability under the NOPV and the ongoing market risk," and that the company's inability to replace this credit line through Houston banks led to the cessation of crude oil trading by the company in May 1981 and a variety of other losses. Affidavit of Richard B. Messig, C.A. No. 81–23, Docket No. 29. The president of Hideca has set forth in an affidavit his belief that DOE subpoenas of its bank records caused "additional concern in the banking community as to the overcharges alleged by the DOE in its NOPV and may jeopardize loan applications." Affidavit of Luis Wolff, C.A. No. 81–23, Docket No. 31. Texas Energy's general counsel similarly has stated on the record that it had received such subpoenas, but does not even allege any impact to its business. Affidavit of Robert C. Finley, C.A. No. 80–622, Docket No. 26. These affidavits do not set forth an injury of such magnitude as to outweigh other elements in the ripeness determination; the connection between DOE enforcement proceedings and the various financial woes alleged is speculative at best. Even if the affidavits are accepted as true, the mere existence of a large potential liability cannot render a case ripe when the other necessary elements of ripeness have not been satisfied. *See Cities Service Corp. v. DOE*, 520 F.Supp. at 1142 (possible $250,000,000 liability); *Texaco, Inc. v. DOE*, 490 F.Supp. at 889 (possible $888,000,000 liability).

In short, the Court is unable to find the requisite direct and immediate impact on

plaintiffs from these regulations. As this Court noted in a slightly different context:

Although plaintiffs are undoubtedly faced with some uncertainty respecting their future pricing policies, they are under no present obligation to do anything, there is no immediate and substantial threat of sanctions or expected conformity to any final statutory directive, and it is distinctly possible that plaintiffs may prevail at the administrative level and their nightmare scenario respecting penalties may never come to pass.

*National Distillers and Chemical Corp. v. DOE*, 498 F.Supp. at 719. The Court therefore will not address the remaining contentions of plaintiffs, because they have failed to meet this critical element. The Court will instead dismiss the actions as unripe.

An order will issue in accordance with this opinion.